IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| *In re:* | : | Chapter 11 (Small Business Subchapter V) |
|  | : |  |
| AUGUSTUS INTELLIGENCE INC.,[1] | : | Case No. 21-10744  (JTD) |
|  | : |  |
|  | : |  |
| Debtor. | : |  |
|  | : |  |
|  | : |  |

## SMALL BUSINESS DEBTOR'S REVISED FIRST AMENDED PLAN OF LIQUIDATION

You are encouraged to carefully review the full text of this document, including all exhibits and attachments, before deciding how to vote on the Plan. To assist you in your review, please note that a list of definitions and a section of frequently asked questions appear at the end of this document.

**IN ADDITION TO CASTING YOUR VOTE TO ACCEPT OR REJECT THE PLAN, YOU MAY OBJECT TO CONFIRMATION OF THE PLAN. IF YOU WISH TO OBJECT TO CONFIRMATION OF THE PLAN, YOU MUST DO SO BY JULY 19, 2022 AT 4:00 P.M. EST.**

**YOUR BALLOT STATING HOW YOU ARE VOTING ON THE PLAN MUST BE RETURNED BY JULY 19, 2022 AT 4:00 P.M. EST.   COMPLETED BALLOTS CAN BE SUBMITTED BY MAIL, OVERNIGHT COURIER, OR HAND DELIVERY TO THE FOLLOWING ADDRESS:**

> **AUGUSTUS BALLOT PROCESSING c/o STRETTO**
> **410 EXCHANGE, SUITE 100**
> **IRVINE, CA 92602**

**OR BY SUBMITTING AN ELECTRONIC BALLOT (AN "E-BALLOT") THROUGH THE VOTING AGENT'S DEDICATED, E-BALLOT PORTAL (THE "E-BALLOTING PORTAL"). TO SUBMIT YOUR BALLOT THROUGH THE E-BALLOTING PORTAL, VISIT  HTTPS://CASES.STRETTO.COM/AUGUSTUS, CLICK ON THE "SUBMIT E-BALLOT" SECTION OF THE WEBSITE AND FOLLOW THE INSTRUCTIONS TO SUBMIT YOUR E-BALLOT.**

**IF YOU ARE CASTING A BALLOT USING THE E-BALLOT PORTAL YOU SHOULD NOT ALSO SUBMIT A PAPER BALLOT.  BALLOTS SUBMITTED BY EMAIL OR FACSIMILE WILL NOT BE ACCEPTED**

---

[1]    The Debtor and the last four digits of its federal taxpayer identification number is (7374).

1

**A HEARING ON THE CONFIRMATION OF THE PLAN IS SCHEDULED FOR JULY 26, 2022 AT 2:00 P.M. EST IN COURTROOM NO. 5, FIFTH FLOOR, AT THE U.S. BANKRUPTCY COURT, DISTRICT OF DELAWARE, 824 N. MARKET STREET, WILMINGTON, DELAWARE 19801.**

Your rights may be affected by this Plan. You should consider discussing this document with an attorney.

June 14, 2022

**ARCHER & GREINER, P.C**.
Bryan J. Hall (No. 6285)
300 Delaware Avenue, Suite 1100
Wilmington, Delaware 19801
302.777.4350
bjhall@archerlaw.com

-and-

**THOMPSON COBURN HAHN & HESSEN LLP**
Mark T. Power (admitted *pro hac vice*)
Joseph Orbach (admitted *pro hac vice*)
488 Madison Avenue
New York, New York 10022
(212) 478-7200
mpower@thompsoncoburn.com
jorbach@thompsoncoburn.com

Co-Counsel for the Debtor and
Debtor-in-Possession

## SUMMARY OF THE PLAN AND DISTRIBUTIONS TO CREDITORS

Augustus Intelligence, Inc., as the debtor and debtor-in-possession in the above-captioned chapter 11 case, subchapter V, files this proposed Revised First Amended Plan of Liquidation pursuant to applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Bankruptcy Rules, including without limitation 11 U.S.C. §§ 1189-1191.

The Plan provides for the creation of a Litigation Trust. As of the Effective Date of the Plan, all of the Debtor's Estate Causes of Action and Assets (to the extent not Abandoned) will be transferred to the Litigation Trust and the Debtor will be dissolved. A Litigation Trustee shall be appointed, who shall be the fiduciary responsible for administering the Litigation Trust, including, among other things, the sale and liquidation of all remaining Debtor's Assets, pursuing potentially significant litigation claims of the Estate against third parties, and objecting to any disputed Claims or Equity Interests. After the payment of expenses and funding of reserves for the Litigation Trust, proceeds generated from the sale of the Debtor's Assets and net recoveries realized from the pursuit of litigation claims will be distributed to holders of Allowed Expenses and Claims and Equityholders in accordance the terms of this Plan, which is consistent with the priority scheme set forth in the Bankruptcy Code.

The Plan also contains an option for Holders of Equity Interests to elect to assign to the Litigation Trust any individual claims or causes of action they may have in connection with the purchase of their Equity Interest. The Litigation Trustee can then decide whether to pursue such Assigned Litigation Claims separately or together with Estate Causes of Action against common defendants. This should help reduce the overall cost of litigation and minimize the Estate Causes of Action and the Assigned Litigation Claims from competing against each other when pursuing claims against common defendants, who have limited resources available to satisfy all judgments obtained.

The Plan provides that with respect to net recoveries realized solely from Assigned Litigation Claims, such recoveries will be distributed *Pro Rata* among Assigning Equity Interest Holders only. With respect to net recoveries realized from a combination of Assigned Litigation Claims and Estate Causes of Action against the same defendants, the allocation of such recoveries between Assigning Equity Interest Holders and Holders of Administrative, Priority and General Unsecured Claims will be determined by the Bankruptcy Court, after a motion on notice is filed by the Litigation Trustee.

Creditors and Equity Interest Holders will receive their Pro Rata share of recoveries as set forth in further detail below. The exact amount of recoveries to Creditors and Equity Interest Holders will be dependent on the success of the Asset sales and the outcome of the contemplated litigations. The table below sets forth each class of Creditors and Equity Interests along with the range of potential recoveries. There is no guarantee that any recovery will be achieved and the estimates below represent the Debtor's good faith estimates as of the date hereof.

| Class | Claim/Equity Interest | Unimpaired/ Impaired | Treatment of Claim/Equity Interest | Estimated Amount of Allowed Claims on Effective Date | Projected Recovery Under the Plan |
|---|---|---|---|---|---|
| N/A | Administrative Claims | Unimpaired | Paid as described below. | $1,000,000 - 1,500,000 | 100% |
| N/A | Priority Tax Claims | Unimpaired | To be paid in the ordinary course upon the filing of required tax returns. | $0-$50,000 | 100% |
| 1A | DIP Facility Claim | Impaired | After payment of or reserve in full for the Professional Fee Carveout as set forth in the DIP Facility, the Debtor shall pay the full amount of the DIP Facility Claim, plus all accrued PIK Interest (which such interest shall continue to accrue until payment in full) and all other fees as soon as the Debtor has available Cash from the Asset Sales and/or Causes of Action.  In addition, solely to the extent that the DIP Facility Claim is not paid in full in Cash, the Holder of the DIP Facility Claim may be entitled to share in any net recoveries realized from a combination of Assigned Litigation Claims and Estate Causes of Action in an amount to be determined by the Bankruptcy Court up to an amount sufficient to pay the DIP Facility Claim in full, after a motion on notice is filed by the Litigation Trustee. | $700,000- $1,100,000 | 100% |
| 1B | Other Secured Claims | Unimpaired | Except to the extent that a Holder of an Allowed Class 1B Secured Claim has been paid prior to the Effective Date or agrees to a different treatment, on or as soon as is reasonably practicable after | $0 | 100% |

| Class | Claim/Equity Interest | Unimpaired/ Impaired | Treatment of Claim/Equity Interest | Estimated Amount of Allowed Claims on Effective Date | Projected Recovery Under the Plan |
|---|---|---|---|---|---|
| | | | the later of (a) the Effective Date, but in no event later than thirty (30) days after the Effective Date (or 30 days after such date the claim becomes Allowed)  the Debtor shall either: (i) pay the Claim in Cash in an amount equal to such Allowed Class 1B Secured Claim; or (ii) release to such Holder the collateral securing such Allowed Class 1B Secured Claim. In either event, such payment or release of collateral shall be in full satisfaction, of the Claim. | | |
| 2 | Priority Unsecured Claims | Unimpaired | After payment of or reserve in full for all Administrative Claims, Priority Tax Claims, and DIP Facility Claim, except to the extent that a Holder of an Allowed Priority Claim has agreed to a less favorable treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Priority Claim, as soon as the Debtor has available Cash from the Asset Sales and/or Causes of Action, Cash in an amount equal to such Allowed Priority Claim, on or as soon as reasonably practicable after the later of (a) the Effective Date; (b) the date the Priority Claim becomes an Allowed Claim; or (c) the date for payment provided by any agreement or arrangement between the Debtor, as the case may be, and the Holder of the Allowed Priority Claim. <br><br> In addition, solely to the extent that | $0-$50,000 | 100% |

| Class | Claim/Equity Interest | Unimpaired/ Impaired | Treatment of Claim/Equity Interest | Estimated Amount of Allowed Claims on Effective Date | Projected Recovery Under the Plan |
|---|---|---|---|---|---|
| | | | the Allowed Priority Claims are not paid in full in Cash, the Holders of the Allowed Priority Claims may be entitled to share *Pro Rata* in any net recoveries realized from a combination of Assigned Litigation Claims and Estate Causes of Action in an amount to be determined by the Bankruptcy Court up to an amount sufficient to pay the Allowed Priority Claims in full, after a motion on notice is filed by the Litigation Trustee. | | |
| 3 | General Unsecured | Impaired | After payment of or reserve in full for all Administrative Claims, Priority Tax Claims, DIP Facility Claim and Class 2 Claims, the Debtor shall pay up to the full amount of the Class 3 General Unsecured Claims (without interest) as soon as the Debtor has available Cash from the Asset Sales and/or Causes of Action.

In addition, solely to the extent that the Allowed General Unsecured Claims are not paid in full in Cash, the Holders of Allowed General Unsecured Claims may be entitled to share *Pro Rata* in any net recoveries realized from a combination of Assigned Litigation Claims and Estate Causes of Action in an amount to be determined by the Bankruptcy Court up to an amount sufficient to pay the Allowed Priority Claims in full, after a motion on notice is filed | $2,000,000-$4,400,000 | 0-100% |

| Class | Claim/Equity Interest | Unimpaired/ Impaired | Treatment of Claim/Equity Interest | Estimated Amount of Allowed Claims on Effective Date | Projected Recovery Under the Plan |
|---|---|---|---|---|---|
| | | | by the Litigation Trustee. | | |
| 4A | Equity Interests – Assigned Litigation Claims | Impaired | After payment of or reserve in full for all Administrative Claims, Priority Tax Claims, DIP Facility Claim, Class 2 Claims and Class 3 Claims, the Debtor shall pay all excess recoveries *Pro Rata* to Holders of Allowed Class 4A and 4B Equity Interests as soon as the Debtor has available cash from the Asset Sales and/or Causes of Action (other than Assigned Litigation Claims).<br><br>In addition, Holders of Class 4A Equity Interests shall be entitled to share *Pro Rata* in any net recoveries realized solely from Assigned Litigation Claims.<br><br>In addition, Holders of Class 4A Equity Interests may be entitled to share *Pro Rata* in any net recoveries realized from a combination of Assigned Litigation Claims and Estate Causes of Action in an amount to be determined by the Bankruptcy Court up to an amount sufficient to pay the Allowed Priority Claims in full, after a motion on notice is filed by the Litigation Trustee. | $0-$33,500,000 | 0-100% |
| 4B | Equity Interests – No Assigned Litigation Claims | Impaired | After payment of or reserve in full for all Administrative Claims, Priority Tax Claims, DIP Facility Claim, Class 2 Claims and Class 3 Claims, the Debtor shall pay all excess recoveries Pro Rata to | $0-$33,500,000 | 0-100% |

| Class | Claim/Equity Interest | Unimpaired/ Impaired | Treatment of Claim/Equity Interest | Estimated Amount of Allowed Claims on Effective Date | Projected Recovery Under the Plan |
|---|---|---|---|---|---|
| | | | Holders of Allowed Class 4A and 4B Equity Interests as soon as the Debtor has available Cash from the Asset Sales and/or Causes of Action (other than Assigned Litigation Claims).<br><br>In addition, Holders of Class 4A Equity Interests may be entitled to share *Pro Rata* in any net recoveries realized from a combination of Assigned Litigation Claims and Estate Causes of Action in an amount to be determined by the Bankruptcy Court, after a motion on notice is filed by the Litigation Trustee.<br><br>Holders of Class 4B Equity Interests shall not be entitled to share in any net recoveries realized solely from Assigned Litigation Claims. | | |
| 5 | Subordinated Equity Interests | Deemed Rejected | Holders of Subordinated Equity Interests are entitled to no distribution under the Plan and are deemed to have rejected the Plan. | Unknown | 0.00% |

## ARTICLE 1
## HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTOR

### 1.1    Nature of the Debtor's Business.

On July 7, 2015, Wolfgang Haupt ("Mr. Haupt") originally formed Augustus Collective, LLC, a Delaware domestic limited liability company ("Collective").[2]  Mr. Haupt served as the managing member of Collective.  George Glueck subsequently became a minority member of Collective ("Mr. Glueck").  Collective was originally formed with the intent to act as a holding company to acquire equity positions in small businesses and invest in certain strategic assets.

On June 29, 2018, Augustus Intelligence Inc., the debtor and debtor-in-possession herein ("Augustus" or the "Debtor"), was incorporated in Delaware.  That same day, Collective was converted into and merged with Augustus (the "Conversion").  By operation of the Conversion, all assets of Collective became assets of Augustus at the time of the Conversion.

Mr. Haupt was the controlling shareholder of Augustus and served in the position of Chief Executive Officer and Chairperson of the Board from the date of its incorporation, until he temporarily stepped down in the summer of 2020 and then formally resigned as CEO in November 2020.

Prior to his resignation, at the time of the Conversion, Mr. Haupt was anticipating raising additional capital for the company through a Series Seed round so he elected to change Collective into a Delaware corporation in order to change the capital structure and issue new common stock.  He also wanted to change Collective's name to Augustus Intelligence in order to be consistent with his stated new focus of developing artificial intelligence ("AI") software technology to be licensed to U.S. and international commercial businesses operating in a variety of different industries.

Mr. Haupt's stated vision was to build an integrated AI company inclusive of data centers.  Later joined by Pascal Weinberger (together the "Prior Management"), who was promoted as an AI specialist, they tried to realize this idea by building up a core tech team and raising funds for direct investments.

Starting in mid-2018 through early 2019, Augustus and Mr. Haupt embarked on an ambitious fundraising effort, raising approximately $33.5 million, plus an additional $80 million in subscriptions in capital, from 35-40 private investors at a $250 million pre-money valuation (collectively, the "Seed Investors" and, together with the other stockholders other than Mr. Haupt, the "Investors"). Augustus initially used the funds for operating costs and to hire talented software and technology engineers, develop technology, and fund research and development. Augustus currently has developed or acquired, through subsidiary acquisitions, certain patents and patents pending and AI functional bricks in connection with its proprietary technology.

In addition, Augustus closed on two acquisitions of other loss-making companies in the AI industry resulting in an increase in the number of customers served. Augustus, through its

---

[2]    Prior to Collective, Mr. Haupt owned a company called Banda Apparel.

non-debtor U.S. and foreign subsidiaries, has approximately 30 clients and partners utilizing its proprietary AI technology ("AI Technology"). Furthermore, AI technology is deployed in a large retail customer with 1,400+ retail locations in the United States.

### 1.2    Independent Investigation of the Debtor

Since the spring of 2020, different German newspapers published various assertions made by certain former Augustus employees. On March 6, 2020, German weekly *Der Spiegel* published its first article about Augustus. This article sensationalized the claims of certain former disgruntled employees.

A second negative article was published in June 2020. It focused on Philipp Amthor, a member of the German parliament, who was then a member of Augustus's Board of Directors, and on other connections with former politicians or German security agency executives. Two additional articles followed in different newspapers, which alleged misrepresentations made by former board member Pascal Weinberger in his resume. One negative press article, *Der Spiegel*, went so far as to mistakenly imply that Augustus was an empty shell without revenues, employees and IP rights.

The Debtor understands that the targets of such articles dispute the assertions made therein.

By the summer of 2020, Augustus had spent more than $30 million of its initial capital raise and a number of Seed Investors began to raise concerns about the actions of Prior Management and members of the Board of Directors at the time (the "Old Board") in managing the company. At this point, Augustus had hit a "burn rate" of approximately $3.7 million a month, with an expanded staff of over 100. Further, the German press speculated about senior executives' spending excessive amounts on unnecessary corporate expenditures and Augustus's maintaining expensive offices in One World Trade Center, which further fueled Investors' concerns.

To address the press allegations and Investors' concerns, the Old Board and Prior Management in June 2020 initiated an internal investigation in order to try to assess and refute the allegations made in the German media.  Mr. Haupt temporarily stepped down in the summer of 2020 and then formally resigned as CEO in November 2020. Prior Management retained the law firm Armstrong Teasdale to undertake an independent investigation of the press allegations.

Since its inception, Augustus suffered from poor governance. It experienced a number of operational and managerial issues, including an unfocused business model, overly complex financial and corporate structure, weak financial processes, budgeting, spending and controls over compensation, poor integration of acquisitions, the retention of expensive outside advisors and consultants, and a lack of reporting and communication with Investors. As a result of continued Investor concerns, the independent investigation was broadened to include the conduct of Mr. Haupt and Prior Management.

In July 2020, several shareholders decided to replace the entire Board of Directors with three new directors, Stefan Liechtenstein, Kathleen Barnett Einhorn, and Wilko von Pelchrzim, with Stefan Liechtenstein serving as Chairperson. In November, Ronald S. Rolfe was selected separately by the minority group of the Investors to serve as an independent director, thus

forming the Current Board of Directors (the "<u>Current Board</u>"). The Current Board recognized the need for a neutral, independent, special situations Chief Executive who could restore confidence, restructure the business and its operations, reduce excessive expenses and broker a settlement between Investors.  Mr. Haupt voluntarily formally resigned as Chief Executive Officer. The Current Board appointed A.B. Hussain as the new Chief Executive Officer of Augustus.

In December 2020, recognizing the need to position Augustus for proceedings such as these and to assist as the independent investigation continued, the new CEO and the Current Board retained Emmet Keary as its General Counsel.

In January 2021, Armstrong Teasdale approached the Current Board about retaining Alix Partners ("AP") to assist with the forensic accounting aspect of the investigation. The Current Board authorized that retention.

On April 24, 2021 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under the Bankruptcy Code following receipt of a subpoena from the Securities and Exchange Commission ("SEC") and elected to proceed under subchapter V of chapter 11. The Chapter 11 Case is pending in the Bankruptcy Court in Wilmington, Delaware.

Prior to the Petition Date, Armstrong Teasdale and AP reported to the Current Board that they were close to completion of their respective reports on the results of their Investigations. Unfortunately, before they could complete their reports, Augustus filed its chapter 11 petition. As a result, Armstrong Teasdale and Alix Partners ceased any further work on finalizing their reports until their retentions could be approved by the Bankruptcy Court and there was an acceptable resolution negotiated of their approximately $600,000 in unpaid professional fees and expenses.

The Investigation resumed on December 8, 2021, pursuant to an Order entered by the Bankruptcy Court [ECF#158]. The Order approved Armstrong Teasdale's retention as Special Counsel, as well as its retention of forensic investigators, AP. While Armstrong Teasdale had previously been directed to present its final findings orally, pursuant to the Stipulation entered in connection with the Bankruptcy matter, Armstrong Teasdale agreed to submit a confidential written detailed report to the appointed U.S. Trustee, and to counsel for the Debtor.

On or about December 17, 2021, Armstrong Teasdale submitted their Detailed Report, along with Alix Partner's Forensic Report, to the Debtor.  The Detailed Report runs 126 pages and incorporates hundreds of documents, which are referenced in the body or footnotes of the Detailed Report.  Based on the investigation, the Detailed Report identifies numerous potential Causes of Action and claims that the Debtor and the Equity Interest Holders may have against third parties.

In order to preserve the Debtor's privileged communications and potential litigation strategies, the Detailed Report has not been made publicly available.  Instead, Debtor's bankruptcy counsel prepared an Executive Summary of the Detailed Report, which has been publicly filed on the Bankruptcy Court's docket [ECF#189].  A copy of the Executive Summary is annexed hereto as Exhibit B.

### 1.3    Legal Structure and Ownership.

Augustus is incorporated in Delaware and headquartered in New York, New York. Augustus is a holding company, with the business operations being conducted at the subsidiary level. Augustus has seven non-debtor direct or indirect wholly-owned or majority-owned subsidiaries: Augustus Commerce, LLC, Union Square Linens LLC, Augustus France, xBrainsoft, xBrainsoft Inc., Arcus Applied Artificial Intelligence GmbH (f/k/a Augustus Intelligence, GmbH) ("GmbH"), and Augustus Italia (collectively, the "Subsidiaries"). All of the Subsidiaries are non-debtors.

**Exhibit A** to this Plan is a copy of the Debtor's corporate organization chart.

After a reorganization under new management in the autumn of 2020, each of the operating Subsidiaries serviced its respective customers within its market utilizing Augustus's AI Technology in exchange for paying Augustus the majority of its respective net profits and a percentage of its respective revenues. As of the Petition Date, Augustus and its Subsidiaries had 33 full-time and part-time employees and independent contractors. However, as of August 1, 2021, the Debtor had one remaining employee on the payroll, Emmet Keary, the President and General Counsel, with other critical former employees agreeing to enter into part-time consulting agreements with the Debtor.

### 1.4    Debtor's Assets.

The Debtor filed detailed Schedules of Assets and Liabilities with the Court on May 21, 2021 [Doc. No. 49]. The Schedules set forth all of the Debtor's assets and liabilities as of the Petition Date. The Debtor's assets include, among other things, its equity interests in the Subsidiaries. Additionally, the Debtor has various litigation claims as identified by Armstrong Teasdale, which represent a significant asset of the Debtor.

### 1.5    Debtor's Liabilities.

As of the Petition Date, the Debtor had no secured debt. As a result of the DIP Financing, the Debtor owes its secured lender approximately $710,000 as of the date of this Plan, exclusive of interest and accrued fees.[3] Subject to the Professionals Carveout, the Secured Lender has a valid Lien on substantially all of the Debtor's Assets.

Although additional claims have been filed, the Debtor's records reflect that total unsecured liabilities owed by Augustus as of the Petition Date are approximately $2.1 million. In addition, there are various disputed, unliquidated claims asserted against the Debtor by certain former employees or other parties (see below).

With respect to the Debtor's equity interests, Mr. Haupt holds on a fully diluted basis approximately 67.89% of the equity, with super majority voting rights. The Debtor anticipates that the Litigation Trustee will, among other things, seek to subordinate Mr. Haupt's Equity

---

[3]    The amount of the DIP Loan is expected to increase by an additional $200,000-$250,000 by the Confirmation Hearing.

Interests. On May 27, 2021, the Debtor filed with the Court an amended list of Equity Interest Holders [Doc. No. 54].

### 1.6    Current and Historical Financial Conditions.

The Debtor has filed monthly operating reports through February 2022 [Doc. Nos. 46, 105, and 195-201] and incorporates those statements by reference.

Since the Petition Date, the Debtor has significantly pared back its operations. However, despite cutting costs, the Debtor continues to lose money and the only path forward for the Debtor is a sale of the operating subsidiaries and the prosecution of all litigation claims.

### 1.7    Events Leading to the Filing of the Bankruptcy Case.

The German negative media campaign, the investigation, and the litigation with certain former employees caused a further increase in costs, paralyzed Augustus's operating business, and hindered its ability to obtain new revenue sources and fundraising efforts. At the time the Current Board was appointed, it became clear that Augustus would need to raise additional capital. Augustus is party with Kevin Washington to a Series Seed Preferred Stock Investment Agreement dated November 26, 2018, pursuant to which Mr. Washington agreed to purchase preferred stock in Augustus for $20,000,904 in cash and $30,000,000 in kind for an interest in certain data centers, which, upon information and belief, Mr. Washington indirectly owns. Augustus is party with Alexis Richard Bachofen von Echt (together with Kevin Washington, the "Equity Purchasers") to a Series Seed Preferred Stock Investment Agreement executed May 4, 2020 (together with Mr. Washington's agreement, the "Investment Agreements"), pursuant to which Mr. Bachofen von Echt agreed to purchase preferred stock in Augustus for $20,000,000 in cash and $10,000,000 in kind for an interest in Green Frame Holdings LLC, an entity which, upon information and belief, Mr. Bachofen von Echt owns. Despite Augustus's efforts to obtain the promised capital from the Equity Purchasers, both Equity Purchasers wrongfully refused to honor their obligations under their respective Investment Agreements, resulting in Augustus and its stakeholders suffering significant damages. Augustus is currently analyzing the potential for bringing damage claims against the Equity Purchasers.

The Current Board and the new CEO initiated a rigid cost-cutting program. They implemented a significant reduction in force in order to reduce payroll expenses, entered into a sublease for Augustus's Manhattan headquarters space in order to reduce rental expenses, and took a number of other steps to reduce the Debtor's cash burn by 90%. However, those cost cutting measures proved insufficient for Augustus to become cash flow positive as it only had approximately $2 million in recurring revenue after spending over $30 million.

On March 10, 2021, Mr. Haupt signed a temporary and conditional proxy of his voting rights to the Chairman and new CEO. On March 11, 2021, the Chairman and new CEO gave an irrevocable proxy to the independent representative of the minority shareholders, Ronald Rolfe, for an upcoming shareholder meeting. On March 12, 2021, the new CEO received support from a majority of shareholders for an additional project. Augustus attempted to raise external capital to address its perilous cash position as a result of the aforementioned intransigence on the part of the Controlling Founder. The new CEO was finally able to progress with plans to seek external capital when an additional and ultimately final blow was dealt. On March 15, 2021, Augustus

received a notice from the SEC and Exchange Commission that it was opening a file to investigate the conduct of Prior Management and its equity raise based on a complaint it had received from an unknown party (the "SEC Investigation").[4] This was effectively the last straw, rendering anything but DIP financing impossible.

In addition to continuing to lose cash from operations, Augustus continued to incur significant professional and advisory fees in connection with the long-running independent investigation, the SEC Investigation and other issues involving disgruntled Investors. As a result, Augustus's remaining cash became perilously low and creditors as well as shareholders needed to be protected, forcing the Current Board to pass a resolution to support filing its Chapter 11 petition and to seek to employ the various restructuring professionals with Court Approval.

### a.    Significant Events During the Bankruptcy Case.

Following the Petition Date, the Court authorized the Debtor to retain Hahn & Hessen LLP[5] and Archer & Greiner as co-counsel to the Debtor.  The Court also authorized the Debtor to retain RK Consultants, LLC to provide a Chief Restructuring Officer and designating Brian Ryniker as CRO.  Finally, the Court authorized the Debtor to retain Stretto as claims and noticing agent and as administrative agent.

Shortly after the Petition Date, the Debtor requested, and received authority, to borrow up to $2 million (the "DIP Financing").  The Debtor has been operating in accordance with the DIP budget and has pared back expenses as much as possible.  To that end, the Debtor requested, and received authority, to reject its lease at One World Trade Center.  The Debtor has continued its limited operations on a fully remote basis.

Subsequent to the bankruptcy filing, the Debtor cooperated with the SEC Investigation and is pleased to report that the SEC has informed the Debtor that it has concluded its investigation and will not be taking any action at this time.

Following the Petition Date, the Debtor imposed a number of cost cutting measures given its limited availability under its DIP Financing.  One of the cost cuts imposed was initially reducing and ultimately stopping the Debtor's continued funding of GmbH expenses.  Since GmbH has no other source of income and limited available cash, these cuts have had a severe negative impact on GmbH's business and its ability to survive.

Based on discussions with German counsel, under German law, a manager of a business is required to put the business into an insolvency proceeding if its ability to pay its debts drops below a certain level and if the manager fails to do so, he or she can be held personally liable for those losses.  GmbH's manager is Wilko v. Pelchrzim ("WvP").  WvP is also a member of the Board of Directors of the Debtor.

---

[4]    After the Petition Date, the SEC advised the Debtor by letter that it did not intend on pursuing further enforcement actions with respect to its investigation.

[5]    Hahn & Hessen subsequently merged with Thompson Coburn LLP and is now Thompson Coburn Hahn & Hessen LLP.

At the end of June with GmbH quickly running out of cash, the only alternative appeared to be for the Debtor to shut down the business and liquidate GmbH through a German bankruptcy proceeding.  As an alternative, the CRO, together with the lead bankruptcy counsel, approached WvP to see if he would be willing to acquire the Debtor's equity interest in GmbH in exchange for a combination of a cash payment and an earnout.

After several weeks of negotiations, the Debtor was ultimately able to agree with WvP on terms for the acquisition of GmbH's stock pursuant to that certain Stock Purchase Agreement, dated July 13, 2021, by and among the Debtor as seller and Oglive Advisory UG ("Oglive"), a company owned by WvP (the "SPA").

Under the terms of the Stock Purchase Agreement, Oglive agreed to pay $75,000 (the "Cash Purchase Price") in three (3) installments, with the final payment due sixty days after the Closing Date (as defined in the SPA).  In addition to the Cash Purchase Price, Oglive agreed to pay (or cause GmbH to pay) to the Debtor twenty percent (20%) of all annual net income earned by GmbH for the calendar years ending December 31, 2021, December 31, 2022 and December 31, 2023 by the end of March of each following year, provided that Buyer shall be entitled to first receive an eight percent (8.0%) annualized investment return on any cash investments it makes to GmbH during such period (the "Earnout Purchase Price").  Additionally, as a condition of the sale, all intercompany claims between the Debtor and GmbH were released.

On July 16, 2021, the Debtor filed a motion to approve the sale of its GmbH stock to Oglive, subject to the submission of higher or better offers.  On August 3, 2021, the Bankruptcy Court entered an order approving the sale to Oglive. [ECF#115]  The sale closed and the cash purchase price has been paid.

### b.      The Debtor's Interests in Non-Debtor Subsidiaries and Other Entities.

With respect to the other Subsidiaries, the Debtor is actively marketing the sale of its equity interests in its two remaining operating subsidiaries: Augustus Commerce, LLC and xBrainsoft.  The Debtor is currently seeking to liquidate or sell its equity interests in Augustus Italia, a non-operating entity.  Lastly, the Debtor anticipates a dispute with certain investors over the ownership rights in Union Square Linens LLC, which will be pursued by the Litigation Trustee (see below).

Based on a prepetition transaction approved by the Debtor's Board (by its independent director) and a separate affirmative vote of the Debtor's Interest Holders, the Debtor is entitled to a minority equity interest in Applied AI Corporation Limited, a U.K. company ("AAICO"). AAICO was an entity formed to act as a co-sponsor with Stanley Capital, a British investment banking company, to jointing promote the raising of funds as part a SPAC transaction for the purpose of identifying and investing in/acquiring healthcare companies.  The SPAC has since been successful in raising the requisite funds in the market and is currently in the process of identifying and evaluating potential investment opportunities.

It is anticipated that the Litigation Trust will hold, through a newly-formed special purpose Delaware limited liability company, an "Originator Share" to be issued by AAICO. The Originator Share will be entitled to a 20% profit participation right in all remaining profits derived by AAICO from the "SPAC Sponsor" on the "Investor Risk Capital Amount" (after the

holders of AAICO's Class B Shares and Ordinary Shares have each first received achieved a share of the profits derived by AAICO equal to (i) the amount of their then principal investment of Investor Risk Capital Amount and the "AAICO Commitment", respectively,  and (ii) a share of the profits derived by the Company representing an 8% annualized investment return on the amount of their principal investment of the Investor Risk Capital Amount and the AAICO Commitment, respectively).

Because the value of the Debtor's Originator Share is wholly-dependent on the performance of the investments, if any, made by the SPAC over the applicable investment period, the current market value of the Originator Share is presently unknown and the Debtor is currently unable to project what recovery, if any, Creditors and Interest Holders should anticipate receiving from this Asset.

Finally, the Debtor has determined that Augustus France has only liabilities and no assets and as a result, is seeking authorization under the Plan to Abandon its equity interests in Augustus France.

### 1.8    Projected Recovery of Avoidable Transfers

While the ultimate recoveries are difficult to estimate, the Debtor anticipates asserting claims worth several million dollars relating to fraudulent, preferential or other avoidable transfers. While the results of litigation cannot be predicted with certainty and it is possible that other causes of action may be identified, the Debtor intends for all economically viable, bona fide Causes of Action to be pursued by the Litigation Trustee, including all claims uncovered by Armstrong Teasdale in its Detailed Report.

## ARTICLE 2
## THE PLAN

The Debtor's Plan must describe how Creditors will be paid.  As required by the Code, the Plan places Claims and Equity Interests in various classes and describes the treatment that each class will receive. The Plan also states whether each class of Claims or Equity Interests is impaired or unimpaired. A Claim or Equity Interest can be impaired if the Plan alters the legal, equitable or contractual rights to which the Claimants are otherwise entitled. If the Plan is confirmed, each Creditor's or Equity Interest Holder's recovery is limited to the amount provided in the Plan.

Only Creditors in classes that are impaired may vote on whether to accept or reject the Plan, and only Creditors holding Allowed Claims may vote. A class accepts the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Allowed Claims that actually vote, vote in favor of the Plan. Also, a class of Equity Interest holders accepts the Plan when at least two-thirds (2/3) in amount of the allowed Equity Interest holders that actually vote, vote in favor of the Plan. A class that is not impaired is deemed to accept the Plan. As discussed in the following sections, Class 3 (General Unsecured Claims), Class 4A (Equity Interests – Assigned Litigation Claims), Class 4B (Equity Interests – No Assigned Litigation Claims) are impaired and are entitled to vote on the Plan.  Class 5 (Subordinated Equity Interests) are not entitled to receive any distribution under the Plan and are deemed reject the Plan.

Any Class of Claims or Interests that is not occupied as of the record date for voting on this Plan by at least one Claim or Interests, as applicable, shall be deemed deleted from the Plan for all purposes, including for purposes of (i) voting on the acceptance or rejection of the Plan and (ii) determining acceptance or rejection of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

## 2.1    Unclassified Claims.

Certain types of Claims are automatically entitled to specific treatment under the Code. For example, Administrative Expenses and Priority Tax Claims are not classified. They are not considered impaired, and holders of such Claims do not vote on the Plan. Holders of these claims may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code. As such, the Plan does not place the following Claims in any class:

### A.    Administrative Expenses

The Debtor must pay all Administrative Expenses in full, unless otherwise agreed by the holder. If an Administrative Expense is Disputed, the Bankruptcy Court must determine the validity and amount of the Administrative Expense, or in other words, "allow" the Administrative Expense. Any Administrative Expense that is undisputed and is due and owing on the Confirmation Date must be paid in accordance with this Plan, or upon such other terms as agreed upon by the Debtor and the Administrative Claimant or court order. If the Administrative Expense is Disputed, payment will be made after the Administrative Expense is allowed by the Bankruptcy Court.

There are several types of Administrative Expenses, including the following:

1.          If the Debtor incurs debts in the ordinary course of business following its filing of the Chapter 11 Case, Holders of such Administrative Expenses are entitled to be paid in full for the goods or services provided. This ordinary trade debt incurred by the Debtor after the Petition Date will be paid to the extent of available Cash on an ongoing basis in accordance with the ordinary business practices and terms between the Debtor and its trade creditors.

2.          If the Debtor received goods it has purchased in the ordinary course of business within 20 days before the Petition Date, the value of the goods received is an Administrative Expense.

3.          Administrative Expenses also include any post-petition fees and expenses allowed to professionals, and for attorneys and accountants employed upon Bankruptcy Court authority to render services to the Debtor during the course of the Chapter 11 Case. These fees and expenses must be noticed to Creditors and approved by the Bankruptcy Court prior to payment.

The following chart lists the Debtor's estimated Administrative Expenses, and their proposed treatment under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Expenses arising in the ordinary course of business after the Petition Date | $0-$500,000 | Paid in the ordinary course according to terms. |
| Administrative Tax Claims | $0-$50,000 | Paid upon filing the relevant tax return, but in no event will this be paid more than 180 days after such payment is due. |
| Allowed Professional Fees | $1,000,000-$1,100,000 | Following approval of such fees by the Court, paid in full out of DIP Budget Carve-Out. To the extent Allowed Professional Fees exceed amount held in Carve-Out, such amounts will be paid from the first available proceeds received by the Debtor either through the Asset Sales (as described below) or the Causes of Action. |
| Clerk's Office fees | $0 | Paid in full on the Effective Date. |
| Other Administrative Expenses | $0-$50,000 | Paid in the ordinary course according to terms. |
| Subchapter V Trustee | $30,000-$60,000 | Following approval of such fees by the Court, to be paid in full out of DIP Budget Carve-Out. To the extent Subchapter V Trustee Fees exceed amount held in Carve-Out, such excess amounts will be at the same time and manner the Allowed Professional Fees. |
| **Total** | $1,030,000-$1,760,000 | |

### B.   Priority Tax Claims.

Priority Tax Claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Code. Unless the holder of such a § 507(a)(8) Priority Tax Claim agrees otherwise, it must receive the present value of such Claim, in regular installments paid over a period not exceeding 5 years from the order for relief.

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Priority Tax Claims | $0-$50,000 | Following reconciliation and filing of required tax returns to be paid in the ordinary course. |

### 2.2    Classes of Claims and Equity Interests.

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

### A.    Classes of Secured Claims

Allowed Secured Claims are Claims secured by property of the Debtor's bankruptcy Estate (or that are subject to setoff) to the extent allowed as secured Claims under § 506 of the Code. If the value of the collateral or setoffs securing the Creditor's Claim is less than the amount of the Creditor's Allowed Claim, the deficiency will be classified as a general unsecured Claim.

The following chart lists all classes containing the Debtor's secured prepetition and postpetition Claims and their proposed treatment under the Plan:

| Class# | Description | Insider? (Yes or No) | Impairment | Treatment |
|--------|-------------|----------------------|------------|-----------|
| 1A | DIP Facility Claim<br><br>Estimated Total $ Amount of Claims: $700,000-$1,100,000 | Yes | No | After payment of or reserve in full for the Professional Fee Carveout as set forth in the DIP Facility, the Debtor shall pay the full amount of the DIP Facility Claim, plus all accrued PIK Interest (which such interest shall continue to accrue until payment in full) and all other fees as soon as the Debtor has available Cash from the Asset Sales and/or Causes of Action.<br><br>In addition, solely to the extent that the DIP Facility Claim is not paid in full in Cash, the Holder of the DIP Facility Claim may be entitled to share in any net recoveries realized from a combination of Assigned Litigation Claims and Estate Causes of Action in an amount to be determined by the Bankruptcy Court up to an amount sufficient to pay the DIP Facility Claim in full, after a motion on notice is |

| Class# | Description | Insider? (Yes or No) | Impairment | Treatment |
|--------|-------------|----------------------|------------|-----------|
|  |  |  |  | filed by the Litigation Trustee. Estimated payout on claims: 100% |
| 1B | Other Secured Claims Estimated Total Amount of Claims: $0 | No | No | Except to the extent that a Holder of an Allowed Class 1B Secured Claim has been paid prior to the Effective Date or agrees to a different treatment, on or as soon as is reasonably practicable after the later of (a) the Effective Date, but in no event later than thirty (30) days after the Effective Date (or 30 days after such date the claim becomes Allowed)  the Debtor shall either: (i) pay the Claim in  Cash in an amount equal to such Allowed Class 1B Secured Claim; or (ii) release to such Holder the collateral securing such Allowed Class 1B Secured Claim. In either event, such payment or release of collateral shall be in full satisfaction of the Claim. Estimated payout on claims: 100% |

**B.    Classes of Priority Unsecured Claims.**

Certain priority Claims that are referred to in §§ 507(a)(1), (4), (5), (6), and (7) of the Code are required to be placed in classes. The Code requires that each holder of such a Claim receive Cash on the Effective Date of the Plan equal to the allowed amount of such Claim. However, a class of holders of such Claims may vote to accept different treatment.

The following chart lists all classes containing Claims under §§ 507(a)(1), (4), (5), (6), and (a)(7) of the Code and their proposed treatment under the Plan:

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| 2 | Priority unsecured claim pursuant to Section 507<br><br>Estimated amount of claims: $0-$50,000 | Unimpaired | After payment of or reserve in full for all Administrative Claims, Priority Tax Claims, and DIP Facility Claim, except to the extent that a Holder of an Allowed Priority Claim has agreed to a less favorable treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Priority Claim, as soon as the Debtor has available Cash from the Asset Sales and/or Causes of Action, Cash in an amount equal to such Allowed Priority Claim, on or as soon as reasonably practicable after the later of (a) the Effective Date; (b) the date the Priority Claim becomes an Allowed Claim; or (c) the date for payment provided by any agreement or arrangement between the Debtor, as the case may be, and the Holder of the Allowed Priority Claim.<br><br>In addition, solely to the extent that the Allowed Priority Claims are not paid in full in Cash, the Holders of the Allowed Priority Claims may be entitled to share *Pro Rata* in any net recoveries realized from a combination of Assigned Litigation Claims and Estate Causes of Action in an amount to be determined by the Bankruptcy Court up to an amount sufficient to pay the Allowed Priority Claims in full, after a motion on notice is filed by the Litigation Trustee. |

### C.     Class of General Unsecured Claims

General Unsecured Claims are not secured by property of the Estate and are not entitled to priority under § 507(a) of the Code.

The following chart identifies the Plan's proposed treatment of Class 3, general unsecured Claims against the Debtor:

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| 3 | General Unsecured Class<br><br>Estimated Total Amount of Claims:<br><br>$2,000,000-$4,400,000 | Impaired | After payment of or reserve in full for all Administrative Claims, Priority Tax Claims, DIP Facility Claim and Class 2 Claims, the Debtor shall pay the full amount of the Class 3 General Unsecured Claims (without interest) as soon as the Debtor has available Cash from the Asset Sales and/or Causes of Action.<br><br>In addition, solely to the extent that the Allowed General Unsecured Claims are not paid in full in Cash, the Holders of Allowed General Unsecured Claims may be entitled to share *Pro Rata* in any net recoveries realized from a combination of Assigned Litigation Claims and Estate Causes of Action in an amount to be determined by the Bankruptcy Court, after a motion on notice is filed by the Litigation Trustee.<br><br>Estimated payout on claims:  0-100% |

D.    **Class of Equity Interest Holders.**

Equity Interest Holders are parties who hold an ownership interest (*i.e.*, equity interest) in the Debtor. In a corporation, entities holding preferred or common stock are Equity Interest Holders. The following chart sets forth the Plan's proposed treatment of the classes of Equity Interest Holders:

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| 4A | Equity Interests – Assigned Litigation Claims<br><br>Estimated Total Amount of Claims: $0-$33,500,000 | Impaired | After payment of or reserve in full for all Administrative Claims, Priority Tax Claims, DIP Facility Claim, Class 2 Claims and Class 3 Claims, the Debtor shall pay all excess recoveries *Pro Rata* to Holders of Allowed Class 4A and 4B Equity Interests as soon as the Debtor has available cash from the Asset Sales and/or Causes of Action (other than Assigned Litigation Claims).<br><br>In addition, Holders of Class 4A Equity Interests shall be entitled to share *Pro Rata* in any net recoveries realized solely from Assigned Litigation Claims.<br><br>In addition, Holders of Class 4A Equity Interests may be entitled to share *Pro Rata* in any net recoveries realized from a combination of Assigned Litigation Claims and Estate Causes of Action in an amount to be determined by the Bankruptcy Court, after a motion on notice is filed by the Litigation Trustee.<br><br>Estimated payout on Interests:  0-100% |

| 4B | Equity Interests – Non-Assigned Litigation Claims<br><br>Estimated Total Amount of Claims: $0-$33,500,000 | Impaired | After payment of or reserve in full for all Administrative Claims, Priority Tax Claims, DIP Facility Claim, Class 2 Claims and Class 3 Claims, the Debtor shall pay all excess recoveries Pro Rata to Holders of Allowed Class 4A and 4B Equity Interests as soon as the Debtor has available Cash from the Asset Sales and/or Causes of Action (other than Assigned Litigation Claims).<br><br>In addition, Holders of Class 4A Equity Interests may be entitled to share *Pro Rata* in any net recoveries realized from a combination of Assigned Litigation Claims and Estate Causes of Action in an amount to be determined by the Bankruptcy Court, after a motion on notice is filed by the Litigation Trustee.<br><br>Holders of Class 4B Equity Interests shall not be entitled to share in any net recoveries realized solely from Assigned Litigation Claims.<br><br>Estimated payout on Interests:  0-100% |
| 5 | Subordinated Equity Interests<br><br>Estimated Total Amount of Claims: Unknown[6] | Deemed Rejected | Holders of Subordinated Equity Interests are entitled to no distribution under the Plan and are deemed to have rejected the Plan.<br><br>Estimated payout on Subordinated Equity Interests: 0.00%. |

### 2.3    Estimated Number and Amount of Claims Objections.

The Litigation Trustee may object to the priority, amount, or validity of any Claim or the amount or validity of any Equity Interest within two hundred and forty days of the Effective Date (unless extended by the Bankruptcy Court) by filing an objection with the Bankruptcy Court and serving a copy of the objection on the Holder of such Claim or Equity Interest. Additionally, Equity Interests otherwise in Class 4A or 4B may be subject to equitable subordination and reclassification to Class 5. The Claim or Equity Interest objected to will be treated as a Disputed Claim or Disputed Equity Interest, as applicable, under the Plan. If and when a Disputed Claim

---

[6] There are currently no Interests which have been equitably subordinated.  To the extent Interests are later subordinated pursuant to an Order of the Court they will receive the treatment set forth for Class 5.

or Disputed Equity Interest is finally resolved by the allowance of such Claim or Equity Interest, in whole or in part, the Litigation Trustee will pay the applicable distribution, if any, to the Holder of such Allowed Claim or Allowed Equity Interest in accordance with the Plan.

| Class | Approximate Number of Claims to be Objected To[7] | Approximate Dollar Amount of Claims to be Objected To (exclusive of unliquidated claim amounts) |
|---|---|---|
| 2 | 3 | $50,000.00 |
| 3 | 6 | $400,000 - $1,500,000 |
| 4A | TBD | TBD |
| 4B | TBD | TBD |

### 2.4    Treatment of Executory Contracts and Unexpired Leases.

Executory Contracts are contracts where significant performance of the contract remains for both the Debtor and another party to the contract. The Debtor has the right to reject, assume (*i.e.*, accept), or assume and assign these types of contracts to another party, subject to the Bankruptcy Court's approval. The paragraphs below explain the Debtor's intentions regarding its Executory Contracts (which includes its unexpired leases) and the impact such intentions would have on the other parties to the contracts.

The Executory Contracts shown on the exhibit to be filed with the Plan Supplement shall be assumed by the Litigation Trust upon the Effective Date. Assumption means that the Litigation Trust has elected to continue the Debtor's performance of the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Bankruptcy Code, if any. The Plan Supplement exhibit will also list how the Litigation Trustee intends to cure and compensate the other party to such contract or lease for any such defaults that may exist at the time of such assumption.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of future performance, you must file and serve your objection to the assumption within the deadline for objecting to the confirmation of the Plan, unless the Bankruptcy Court has set an earlier time.

Further, the Debtor will be conclusively deemed to have rejected all Executory Contracts and/or unexpired leases not expressly shown on the Plan Supplement exhibit, or not assumed before the date of the order confirming the Plan.

Rejection means that the Debtor/Litigation Trust has elected not to continue to perform the obligations under such contracts or leases. If the Debtor has elected to reject a contract or

---

[7]    Note: this chart does not include potential objections to claims on the basis of duplication or misclassification.

lease, the other party to the contract or lease will be treated as an Unsecured Creditor holding a Claim that arose before the bankruptcy was filed.

The deadline for filing a proof of claim based on a Claim arising from the rejection of an Executory Contract is thirty (30) days from the Confirmation Date. Any Claim based on the rejection of an Executory Contract will be barred if the proof of claim is not timely filed, unless the Bankruptcy Court orders otherwise.

### 2.5    Means for Implementation of the Plan.

The Debtor and Litigation Trustee will implement the Plan through the sale of Estate Assets subsidiaries and the prosecution of Estate Causes of Action and Assigned Litigation Claims.

#### A.    Estate Asset Sales.

The Debtor has been marketing each of its operating subsidiaries and other assets for sale since the Petition Date. Except as set forth below, all sales will be subject to Court approval and open to higher or better offers during the period of time between the filing of a sales motion and the hearing on such motion. Specifically, the Debtor has been actively marketing the sale of its equity interests in xBrainsoft. The Debtor is currently seeking to liquidate or sell its equity interests in Augustus Italia, a non-operating entities and proposes to abandon its equity interest in Augustus France. Lastly, the Debtor anticipates a dispute with certain investors over the ownership rights in Union Square Linens LLC, which will be pursued by the Litigation Trustee. The Debtor estimates that the sale of such subsidiaries will net the Estate less than $500,000 after taking into account the costs of such sales. Some of the sales may close prior to the date a Confirmation Order is entered and some sales may close after the Plan Effective Date.

Bankruptcy Court approval is required for any asset sale equal or greater than $100,000 and/or any asset sale where an insider (as defined by the Bankruptcy Code) is the purchaser of the assets. In the event the Debtor and/or the Litigation Trustee seek to sell an asset for less than $100,000 to a non-insider, then the Confirmation Order will provide that the Debtor and/or Litigation Trustee may close on such sale without further order of the Court.

#### B.    Estate Causes of Action.

**i.    Overview of Litigation Trust**. On the Effective Date, the Litigation Trust shall be established pursuant to the Litigation Trust Agreement for the purpose of selling any remaining Estate Assets, prosecuting and resolving the Estate Causes of Action, objecting to Claims and/or Equity Interests, resolving Disputed Claims, and effecting the Distributions to be made under the Plan to the Holders of Allowed Claims and Interests in accordance with the terms of the Plan. The Beneficiaries of the Litigation Trust shall be the Holders of Allowed Class 1A Claims (Allowed DIP Facility Claim), Allowed Class 3 Claims (General Unsecured Claims) and Allowed Class 4A and 4B Interests (Equity Interests). On the Effective Date, by operation of the Plan, each Holder of Allowed Class 1A, Allowed Class 3 Claims (General Unsecured Claims) and Allowed Class 4A and 4B Interests (Equity Interests). shall (i) become a Beneficiary of the Litigation Trust, (ii) be bound by the Litigation Trust Agreement, and (iii) receive an uncertificated beneficial interest in the Litigation Trust. Pursuant to the Plan, the Litigation Trust shall contain a waterfall for Distributions by which, subject to the Litigation Trust Reserve,

Litigation Trust Distributable Cash shall satisfy, in full and in Cash, and in order of priority set forth above. All beneficial interests in the Litigation Trust shall be subject to such priorities in Distributions.

**ii.        Appointment of Litigation Trustee**. On or before the Plan Supplement Deadline, the Litigation Trustee shall be designated by the Debtor, after consultation with the United States Trustee, the SubChapter V Trustee, and other major EquityHolders who have requested input, and the Litigation Trustee shall be appointed pursuant to the Confirmation Order. The Litigation Trustee shall be the exclusive trustee of the Litigation Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3) as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code. The powers, rights and responsibilities of the Litigation Trustee shall be specified in and subject to the terms of the Litigation Trust Agreement and shall include the authority and responsibility to: (i) receive, manage, invest, supervise and protect the Litigation Trust Assets; (ii) pay taxes and other obligations incurred by the Litigation Trust; (iii) retain and compensate, without further order of the Bankruptcy Court, the services of professionals (the "Litigation Trust Professionals") to advise and assist in the administration, prosecution and Distribution of Litigation Trust Assets; (iv) calculate and implement Distributions of Litigation Trust Distributable Cash; (v) prosecute, compromise and settle all Disputed Claims and all claims and Causes of Action vested in the Litigation Trust; and (vi) pay Professional Fees of professionals retained in the Chapter 11 Case which are Allowed pursuant to any order of the Bankruptcy Court, whether such Professional Fees were incurred before or after the Effective Date. Other rights and duties of the Litigation Trustee shall be set forth in the Litigation Trust Agreement.

**iii.        Compensation of Litigation Trustee**. The Litigation Trustee shall be reasonably compensated out of the Litigation Trust for his services and reimbursed out of the Litigation Trust for his reasonable expenses in accordance with the compensation schedule attached to the Litigation Trust Agreement.

**iv.        Appointment of Litigation Trust Oversight Board**. On or before the Plan Supplement Deadline, the Debtor, after consultation with the United States Trustee, the SubChapter V Trustee, and other major EquityHolders who have requested input, shall file a notice appointing the members of the Litigation Trust Oversight Board (the "Litigation Trust Oversight Board"). The members of the Litigation Trust Oversight Board shall serve without compensation. The Litigation Trustee shall consult with the Litigation Trust Oversight Board with respect to, among other matters described in the Litigation Trust Agreement, (i) settlements of any Cause of Action over Two Hundred and Fifty Thousand Dollars ($250,000.00), (ii) commencement or abandonment of any litigation or other Asset on behalf of the Litigation Trust, and (iii) the retention or termination of any Litigation Trust Professional. The Litigation Trust Oversight Board shall have such other rights and obligations as set forth in the Litigation Trust Agreement.

**v.        Treatment**.    It is intended that the Litigation Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulations Section 301.7701-4(d) and as a "grantor trust" within the meaning of Sections 671 through 679 of the Internal Revenue Code, with no objective to continue or engage in the conduct of a trade or business. In furtherance of this objective, the Litigation Trustee shall, in his business judgment, make continuing best efforts not to prolong unduly the duration of the Litigation Trust. All

Litigation Trust Assets on the Effective Date shall be deemed for federal income tax purposes (i) to have been distributed (subject to any obligations relating to such assets) by the Debtor to the Beneficiaries (other than the Litigation Trusts Assets allocable to the Litigation Trust Reserve and any reserves created with respect to any Disputed Claims) in partial satisfaction of Allowed Claims and (ii) immediately thereafter contributed by such Beneficiaries to the Litigation Trust in exchange for their respective beneficial interests. The Beneficiaries will be treated as the deemed owners of the Litigation Trust (other than the assets allocable to any Litigation Trust Reserve and any reserves created with respect to Disputed Claims). The Litigation Trustee will be responsible for filing information on behalf of the Litigation Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a). Subject to contrary definitive guidance from the Internal Revenue Service or a court of competent jurisdiction (including the receipt by the Litigation Trustee of a private letter ruling if the Litigation Trustee so requests, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Litigation Trustee), the Litigation Trustee may (i) timely elect to treat any disputed claims reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B9 and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Litigation Trustee, the Debtor and the Beneficiaries) shall report for U.S. federal, state and local income tax purposes consistently with the foregoing.  The Litigation Trustee may withhold and pay to the appropriate taxing authority all amounts required to be withheld pursuant to the Internal Revenue Code or any provision of any foreign, state or local tax law with respect to any payment or distribution to the Beneficiaries. All such amounts withheld and paid to the appropriate taxing authority shall be treated as amounts distributed to such Beneficiaries for all purposes of the Litigation Trust Agreement. The Litigation Trustee shall be authorized to collect such tax information from the Beneficiaries (including, without limitation, social security numbers or other tax identification numbers) and forms (including without limitation IRS Form W-8 and IRS Form W-9) as the Litigation Trustee, in his sole discretion, reasonably deems necessary to effectuate the Plan, the Confirmation Order and the Litigation Trust Agreement in accordance with the tax laws of the United States and any state, commonwealth or territory thereof (any such information or forms, "Beneficiary Tax Information"). In order to receive Distributions under the Plan, all Beneficiaries shall identify themselves to the Litigation Trustee and provide tax information and the specifics of their holdings, to the extent the Litigation Trustee reasonably deems appropriate in his sole discretion. The Litigation Trustee may refuse to make a Distribution to any Beneficiary that fails to furnish such information within sixty (60) days of any request therefor by the Litigation Trustee, until such information is delivered; provided, however, that, upon the delivery of such information by a Beneficiary, the Litigation Trustee shall make such Distribution to which the Beneficiary is entitled, without interest; and, provided, further, that, if the Litigation Trustee fails to withhold in respect of amounts received or distributable with respect to any such Beneficiary and the Litigation Trustee is later held liable for the amount of such withholding, such Beneficiary shall reimburse the Litigation Trustee for such liability. The Litigation Trustee shall reserve all Distributions due to any Beneficiary that does not timely provide Beneficiary Tax Information (any such Distribution collectively, the "Beneficiary Tax Reserve") until the earlier of (a) such time that the Beneficiary provides the Beneficiary Tax Information and (b) the final Distribution Record Date. Any Beneficiary that does not timely provide Beneficiary Tax Information to the Litigation Trustee as of the final Distribution Record Date shall not be entitled to receive any Distributions from the Litigation Trust. Any funds that remain in the Beneficiary Tax Reserve as of the final Distribution Record Date shall be distributed Pro Rata to the Beneficiaries of the Litigation Trust in accordance with the terms of

the Litigation Trust Agreement. The Litigation Trustee shall be responsible for filing all federal, state, and local tax returns for the Debtor and the Litigation Trust. The Litigation Trust shall comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all Distributions made by the Litigation Trust shall be subject to any such withholding and reporting requirements.

**vi.     Litigation Trust Assets.** On the Effective Date, pursuant to section 1123(b)(3) of the Bankruptcy Code and by operation of the Plan, the Debtor's Assets shall be transferred by the Debtor (and deemed transferred) to the Litigation Trust, free and clear of all Claims, Liens, charges, encumbrances, rights, and interests, without the need for any person to take any further action or obtain any approval.

The Litigation Trust may pursue any Estate Cause of Action in accordance with the best interests of the Litigation Trust. No person may rely on the absence of a specific reference in the Plan or the Plan Supplement, to any Estate Cause of Action against them as any indication that the Litigation Trust will not pursue any and all available Estate Causes of Action. The Plan expressly reserves for the Litigation Trust all rights to prosecute any and all Estate Causes of Action against any person, except as otherwise provided in the Plan. Unless any Estate Cause of Action against any person are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or an order of the Bankruptcy Court, the Litigation Trust expressly reserves all Estate Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Estate Causes of Action upon, after, or as a consequence of confirmation or consummation of the Plan.

For the avoidance of doubt, the Litigation Trust shall not operate any subsidiary of the Debtor, and the transfer of equity in any subsidiary is solely as a shareholder and not as an operator of any business.

**vii.     Assigned Litigation Claims.**  In addition, the Plan provides an option for Holders of Equity Interest to elect to assign to the Litigation Trust any Assigned Litigation Claims they may have in connection with their purchase of their Equity Interest. An Assignment of Claim Form shall be included with the Ballot, together with a copy of this Plan and Exhibits, to each Equity Holder, which must be filled in and executed and returned to the Claims Agent.  In exchange for agreeing to assign to the Litigation Trust any Assigned Litigation Claims they may have, any net recoveries realized solely from Assigned Litigation Claims collectively will be distributed Pro Rata among Assigning Equity Interest Holders only.  With respect to net recoveries realized from a combination of Assigned Litigation Claims and Estate Causes of Action against the same defendants, the allocation of such recoveries between Assigning Equity Interest Holders and Holders of Administrative, Priority and General Unsecured Claims will be determined by the Bankruptcy Court, after a motion on notice is filed by the Litigation Trustee.

**viii.     Claims Reconciliation Process**. From and after the Effective Date, the Litigation Trust shall be solely responsible for objecting to Claims which are not otherwise Allowed, for seeking to subordinate Equity Interests, for all related aspects of the claims reconciliation process, and for the payment of all costs and expenses incurred by the Litigation Trust in connection with such process.

**ix.**      **Preservation of Right to Conduct Investigations**. Any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 held by the Debtor prior to the Effective Date shall vest with the Litigation Trust upon the Effective Date and shall continue in effect until dissolution or termination of the Litigation Trust.

**x.**      **Preservation of Privilege and Defenses**. No action taken by the Debtor in connection with this Plan shall be (or be deemed to be) a waiver of any privilege or immunity of the Debtor, as applicable, including any attorney-client privilege or work-product privilege attaching to any documents or communications (whether written or oral). The Confirmation Order shall provide that notwithstanding the Debtor providing any privileged information to the Litigation Trustee, the Litigation Trust, or any party or person associated with the Litigation Trust, such privileged information shall be without waiver in recognition of the joint and/or successorship interest in prosecuting any Claim or Cause of Action on behalf of the Estate and shall remain privileged.

**xi.**      **Indemnification and Exculpation.** The Litigation Trustee, the Litigation Trust Professionals, the Litigation Trust Oversight Board, the members of the Litigation Trust Oversight Board and any professionals retained by the Litigation Trust Oversight Board or its members, shall not be liable for actions taken or omitted in such capacities, except those acts arising out of its or their own willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement by the Litigation Trust for fees and expenses in defending any and all of its actions or inactions in such capacities, except for any actions or inactions involving willful misconduct or gross negligence. Any indemnification claim of the Litigation Trustee (and any other parties entitled to indemnification under this subsection) shall be satisfied first from the Litigation Trust Reserve and, then, to the extent the Litigation Trust Reserve is exhausted, from the Litigation Trust Distributable Cash.

**xii.**      **Litigation Trust Agreement Controlling**. In the event of any conflict between this summary or any other provision of the Plan and the Litigation Trust Agreement, then the terms and provisions of the Litigation Trust Agreement shall control. In the event of any conflict between the Confirmation Order and the Litigation Trust Agreement, then the terms of the Confirmation Order shall control. These descriptions of the Litigation Trust and the scope and terms of the Litigation Trust Agreement are qualified in their entirety by reference to the specific terms and conditions of the Litigation Trust Agreement.

### 2.6      Payments.

If the Plan is confirmed under § 1191(a), payments to Creditors provided for in the Plan will be made by the Litigation Trustee.

If the Plan is confirmed under section § 1191(b), except as otherwise provided in the Plan or in the order confirming the Plan, the Subchapter V Trustee shall make all Plan payments to Creditors under the Plan.

**A.**      **Distribution Record Date**. As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtor or its agents shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Interests, except for by death or by operation of law. The

Litigation Trustee shall have no obligation to recognize any ownership transfer of the Claims or Interests occurring after the Distribution Record Date unless specifically notified in writing of a transfer by death or by operation of law. The Litigation Trustee or any party responsible for making Distributions shall be entitled to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

  **B.**  **Date of Distributions**. Except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim or Interest is not Allowed on the Effective Date, on the date that such Claim or Interest becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against or Allowed Interest in the Debtor shall receive the full amount of the Distributions that this Plan provides for Allowed Claims and Allowed Interests in the applicable Class and in the manner provided herein. Distributions made after the Effective Date to Holders of Allowed Claims and Allowed Interests shall be deemed to have been made on the Effective Date and, except as otherwise provided in this Plan, no interest shall accrue or be payable with respect to such Claims or any Distribution related thereto. In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims or Interests, Distributions on account of any such Disputed Claims or Interests shall be made pursuant to the provisions set forth in this Plan. Except as otherwise provided in this Plan, Holders of Claims and Interests shall not be entitled to interest, dividends or accruals on the Distributions provided for herein, regardless of whether such Distributions are delivered on or at any time after the Effective Date.

  **C.**  **Disbursing Agent**. Except as otherwise provided in this Plan, all Distributions under this Plan shall be made by the Litigation Trustee as disbursing agent or such other person designated by the Litigation Trustee as a disbursing agent on the Effective Date (the "Disbursing Agent").

  **D.**  **Rights and Powers of Disbursing Agent**. The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under this Plan; (b) make all Distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of this Plan.

  **E.**  **Delivery of Distributions in General**. Except as otherwise provided in this Plan, Distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Disbursing Agent. Distributions to Holders of Allowed Claims will be made at the address of each such Holder as set forth in the Debtor's books and records. None of the Debtor, the Litigation Trustee shall incur any liability whatsoever on account of any Distributions under this Plan except for gross negligence, willful misconduct or fraud.

  **F.**  **Payments and Distributions on Disputed Claims and Interests**. Distributions made after the Effective Date to Holders of Claims or Interests that are Disputed as of the

Effective Date but which later become Allowed shall be deemed to have been made on the Effective Date. Notwithstanding any provision otherwise in this Plan and except as may be agreed to by the Litigation Trustee and the Holder of a Disputed Claim or Interest, on the other hand, no partial payments and no partial Distributions shall be made with respect to any Disputed Claim or interest until all Disputed Claims or Interests held by the Holder of such Disputed Claim or Interest have become Allowed or have otherwise been resolved by settlement or Final Order.  Notwithstanding the foregoing, until the expiration of the deadline to object to Claims and Interests, the Liquidating Trustee may treat any Claim or Interest as a Disputed Claim or Interest.

**G.    Manner of Payment**. Any Distributions to be made by or on behalf of the Litigation Trustee, pursuant to this Plan shall be made by checks drawn on accounts maintained by the Litigation Trustee or by wire transfer if circumstances justify, at the option of the Litigation Trustee.

**H.    Undeliverable Distributions and Unclaimed Property**. In the event that any Distribution to any Holder is returned as undeliverable or such Holder has not completed and returned to the Liquidating Trustee an IRS W-8 or W-9 form, as applicable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has received a completed IRS form and determined the then-current address of such Holder, at which time such Distribution shall be made as soon as practicable after such Distribution has become deliverable; provided, however, that such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the date of the Distribution. After such date, all "unclaimed property" or interests in property shall revert to the Litigation Trust (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary), and the Claim of any Holder to such property shall be discharged and forever barred.

**I.    Withholding and Reporting Requirements**. In connection with this Plan and all instruments issued in connection therewith, the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Distributions under this Plan shall be subject to any such withholding or reporting requirements.  The Disbursing Agent shall be entitled to require from any Holder of a Claim or Interest such Beneficiary Tax Information as the Disbursing Agent determines in its reasonable business judgment is necessary or appropriate and may withhold all Distributions to such Holder until such Beneficiary Tax Information is received by the Disbursing Agent or the Court orders otherwise by Final Order.

**J.    Surrender Instruments**. Pursuant to Bankruptcy Code section 1143, as a condition precedent to receiving any Distribution under the Plan, each holder of a certificated instrument or note must surrender such instrument or note (other than the DIP Lender) held by it to the Disbursing Agent or its designee. The Disbursing Agent shall send a notice to each Holder of a certificated instrument or note that a distribution is forthcoming but will not be made until the instrument is surrendered.  The notice shall provide instructions for such surrender.  Any holder of such instrument or note that fails to (i) surrender the instrument or note or (ii) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to the Disbursing Agent, as applicable, before the fifth anniversary of the Confirmation Date shall be deemed to have

forfeited all rights and claims and may not participate in any Distribution hereunder. Any Distribution so forfeited shall become property of the Litigation Trust.

**K.**     **Setoffs**. The Litigation Trustee may, but shall not be required to, set off against any Claim or Interest (for purposes of determining the Allowed amount of such Claim or Interest on which a Distribution is made), any claims of any nature whatsoever that the Litigation Trustee may have against the Holder of such Claim or Interest, but neither the failure to do so nor the allowance of any Claim or Interest hereunder shall constitute a waiver or release by the Litigation Trustee of any such claim they may have against the Holder of such Claim or Interest.

**L.**     **Applicability of Insurance Policies**. Except as otherwise provided in this Plan, Distributions to Holders of Allowed Claims and Allowed Interests shall be made in accordance with the provisions of any applicable Insurance Policy. Nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtor, Litigation Trustee or any person may hold against any insurers under any of the Debtor's Insurance Policies, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.   All of the Debtor's Insurance Policies shall be Assumed Contracts.

**M.**     **No Post-petition Interest**. Unless otherwise specifically provided for herein or in the Confirmation Order, or required by applicable bankruptcy law, post-petition interest shall not accrue or be paid on any Claims or Interests, and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date, on such Claim or Interest (for the avoidance of doubt, PIK Interest shall continue to accrue of the DIP Facility Claim).

**N.**     **Distributions Free and Clear**. Except as may be otherwise provided herein, all Distributions under this Plan shall be free and clear of any Liens, Claims, encumbrances, and other interests.

**O.**     **Fractional Dollars; De Minimis Distributions**. Notwithstanding any other provision of this Plan, Cash payments of fractions of dollars shall not be made. Whenever any Distribution to a Holder of a Claim or Interest would otherwise call for Distribution of Cash in a fractional dollar amount, the actual Distribution of such Cash shall be rounded to the nearest whole dollar (up or down), with half dollars (or less) being rounded down. The Litigation Trustee shall not be required to make any Cash payment of less than one hundred dollars ($100.00) with respect to any Claim or Interest.

**2.7**     <u>**Tax Consequences of the Plan.**</u>

**THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL,**

**AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**TO COMPLY WITH INTERNAL REVENUE SERVICE CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS PLAN (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE INTERNAL REVENUE CODE, (B) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN, AND (C) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

### A.    General.

The following discussion summarizes certain material U.S. federal income tax consequences to the Debtor, the Litigation Trust and Holders entitled to vote on the Plan. This discussion is based on current provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the IRS. There can be no assurance that the IRS will not take a contrary view; no ruling from the IRS has been or will be sought nor will any counsel provide a legal opinion as to any of the expected tax consequences set forth below. Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein. Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to Holders of Claims, Holders of Interests, the Litigation Trust or the Debtor. It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences described herein. The following summary is for general information only. The tax treatment of a Holder may vary depending upon such Holder's particular situation. This summary does not address all of the tax consequences that may be relevant to a Holder, including any alternative minimum tax consequences and does not address the tax consequences to a Holder that has made an agreement to resolve its claim in a manner not explicitly provided for in the Plan. This summary also does not address the U.S. federal income tax consequences to persons not entitled to vote on the Plan or Holders subject to special treatment under the U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, foreign persons, partnerships and other pass-through entities, Holders that have a "functional currency" other than the United States dollar and Holders that have acquired Claims or Interests in connection with the performance of services. The following summary assumes that the Claims are held by Holders as "capital assets" within the meaning of Section 1221 of the IRC and that all Claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes. The tax treatment of Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the Distributions provided for by the Plan may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Holder in exchange for the Claim and whether the Holder receives Distributions under the Plan in more than one

taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules are applicable to the Holder. Therefore, each Holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

### B.    U.S. Federal Income Tax Treatment With Respect to the Litigation Trust.

It is intended that the Litigation Trust will be treated as a "grantor trust" for U.S. federal income tax purposes. In general, a grantor trust is not a separate taxable entity. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an advanced ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Debtor is not requesting a private letter ruling regarding the status of the Litigation Trust as a grantor trust. Consistent with the requirements of Revenue Procedure 94-45, however, the Litigation Trust Agreement requires all relevant parties to treat, for federal income tax purposes, the transfer of the Debtor's Assets to the Litigation Trust as (i) a transfer of such assets to the Beneficiaries of the Litigation Trust (to the extent of the value of their respective interests in the applicable Litigation Trust Assets) followed by (ii) a transfer of such assets by such Beneficiaries to the Litigation Trust (to the extent of the value of their respective interests in the applicable Litigation Trust Assets), with the Beneficiaries of the Litigation Trust being treated as the grantors and owners of the Litigation Trust. Each beneficiary of the Litigation Trust will generally recognize gain (or loss) in its taxable year that includes the Effective Date in an amount equal to the difference between the amount realized in respect of its Claim or Interest and its adjusted tax basis in such Claim. The amount realized for this purpose should generally equal the amount of Cash and the fair market value of any other assets received or deemed received for U.S. federal income tax purposes under the Plan in respect of such Holder's Claim. A Holder that is deemed to receive for U.S. federal income tax purposes a non-Cash asset under the Plan in respect of its Claim should generally have a tax basis in such asset in an amount equal to the fair market value of such asset on the date of its deemed receipt. The Plan and the Litigation Trust Agreement generally provide that the Beneficiaries of the Litigation Trust must value the assets of the Litigation Trust consistently with the values determined by the Litigation Trustee for all U.S. federal, state, and local income tax purposes. As soon as possible after the Effective Date, the Litigation Trustee shall make a good faith valuation of the assets transferred to the Litigation Trust. Consistent with the treatment of the Litigation Trust as a grantor trust, the Litigation Trust Agreement and the Plan will require each Holder to report on its U.S. federal income tax return its allocable share of the Litigation Trust's income. Therefore, a Holder may incur a U.S. federal income tax liability with respect to its allocable share of the income of the Litigation Trust whether or not the Litigation Trust has made any Distributions to such Holder. The character of items of income, gain, deduction, and credit to any Holder and the ability of such Holder to benefit from any deduction or losses will depend on the particular situation of

such Holder. In general, a distribution of underlying assets from the Litigation Trust to a Beneficiary thereof may not be taxable to such Holder because such Holders are already regarded for U.S. federal income tax purposes as owning such assets. Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of Distributions from the Litigation Trust. The Litigation Trustee will file with the IRS tax returns for the Litigation Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and will also send to each Holder a separate statement setting forth such Holder's share of items of Litigation Trust income, gain, loss, deduction, or credit. Each such Holder will be required to report such items on its U.S. federal income tax return. The discussion above assumes that the Litigation Trust will be respected as a grantor trust for U.S. federal income tax purposes. If the IRS were to successfully challenge such classification, the U.S. federal income tax consequences to the Litigation Trust and the Beneficiaries of the Litigation Trust could differ materially from those discussed herein (including the potential for an entity level tax to be imposed on all income of the Litigation Trust).

### C.  U.S. Federal Income Tax Treatment With Respect to Holders of Allowed Claims that are Beneficiaries of the Litigation Trust.

Holders of Allowed Claims or Allowed Interests as of the Effective Date that are Beneficiaries of the Litigation Trust should be treated as receiving from the Debtor their respective shares of the applicable assets of the Litigation Trust in satisfaction of their Allowed Claims, and simultaneously transferring such assets to the Litigation Trust. Accordingly, a Holder of such Claim or Interest should generally recognize gain or loss in an amount equal to the amount deemed realized on the Effective Date (as described above) less its adjusted tax basis of its Claim. Additionally, such Holders should generally recognize their allocable share of income, gain, loss and deductions recognized by the Litigation Trust on an annual basis. Because a Holder's ultimate share of the assets of the Litigation Trust based on its Allowed Claim will not be determinable on the Effective Date due to, among other things, the existence of Disputed Claims and the value of the assets at the time of actual receipt not being ascertainable on the Effective Date, such Holder should recognize additional or offsetting gain or loss if, and to the extent that, the aggregate amount of Cash and fair market value of the assets of the Litigation Trust ultimately received by such Holder is greater than or less than the amount used in initially determining gain or loss in accordance with the procedures described in the preceding paragraph. It is unclear when a Holder of an Allowed Claim that is a beneficiary of the Litigation Trust should recognize, as an additional amount received for purposes of computing gain or loss, an amount attributable to the disallowance of a Disputed Claim. The character of any gain or loss as capital gain or loss or ordinary income or loss and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the nature and origin of the Claim; (ii) the tax status of the Holder of the Claim; (iii) whether the Claim has been held for more than one year; (iv) the extent to which the Holder previously claimed a loss or bad debt deduction with respect to the Claim; and (v) whether the Claim was acquired at a market discount. A Holder that purchased its Claim from a prior Holder at a market discount may be subject to the market discount rules of the IRC. Under those rules (subject to a *de minimis* exception), assuming that such Holder has made no election to accrue the market discount and include it in income on a current basis, any gain recognized on the exchange of such Claim generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange. It is possible that the IRS may assert that any loss should not be recognizable until the Litigation Trustee makes its final distribution of the assets of

the Litigation Trust. Holders should consult their tax advisors regarding the possibility that the recognition of gain or loss may be deferred until the final distribution of the assets of the Litigation Trust. Although not free from doubt, Holders of Disputed Claims should not recognize any gain or loss on the date that the Litigation Trust Assets are transferred to the Litigation Trust, but should recognize gain or loss in an amount equal to: (i) the amount of Cash and the fair market value of any other property actually distributed to such Holder less (ii) the adjusted tax basis of its Claim. It is possible, however, that such Holders may be required to recognize the fair market value of such Holder's allocable share of the Litigation Trust Assets, as an amount received for purposes of computing gain or loss, either on the Effective Date or the date such Holder's Claim becomes an Allowed Claim. Holders of Allowed Claims will be treated as receiving a payment of interest (includible in income in accordance with the Holder's method of accounting for tax purposes) to the extent that any Cash or other property received (or deemed received) pursuant to the Plan is attributable to accrued but unpaid interest, if any, on such Allowed Claims. The extent to which the receipt of Cash or other property should be attributable to accrued but unpaid interest is unclear. Each Holder should consult its tax advisor regarding the determination of the amount of consideration received under the Plan that is attributable to interest (if any). A Holder generally will be entitled to recognize a loss to the extent any accrued interest was previously included in its gross income and is not paid in full.

**2.8    Projections in Support of Debtor's Ability to Make Payments Under the Proposed Plan and Terms of Any Litigation Trust Funding**

The Debtor shall include in the Plan Supplement projected financial information as well as the proposed terms of any Litigation Trust Funding, if any, by Litigation Trust Funders.

**ARTICLE 3
FEASIBILITY OF PLAN**

The Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

**3.1    Ability to Initially Fund Plan.**

The Debtor believes that the Debtor will have enough Cash on hand on the Effective Date of the Plan to pay all of the Claims and expenses that are required to be paid on that date or as soon thereafter a reasonably possible. Tables showing the amount of Cash on hand on the Effective Date of the Plan, and the sources of that Cash, shall be set forth in the Plan Supplement.

**3.2    Ability to Make Future Plan Payments And Operate Without Further Proceedings.**

The Debtor must submit all or such portion of the future earnings or other future income of the Debtor to the supervision and control of the Trustee as is necessary for the execution of the Plan. The Debtor is complying with this requirement as it is liquidating all of its assets and litigation claims and the proceeds thereof will be used to satisfy Allowed Claims. Here, since this is a liquidating plan, Distributions to Creditors and Equityholders is wholly-dependent on the

successful sale of Estate Assets and prosecution of Estate Causes of Action and Assigned Litigation Claims.

The final Plan payment is expected to be paid on or before December 31, 2026.

**You Should Consult with Your Accountant or other Financial Advisor If You Have Any Questions Pertaining to These Projections.**

**ARTICLE 4**
**LIQUIDATION ANALYSIS**

To confirm the Plan, the Bankruptcy Court must find that all Creditors and Equity Interest Holders who do not accept the Plan will receive at least as much under the Plan as such Claimants and Equity Interest holders would receive in a Chapter 7 liquidation. A liquidation analysis shall be included in the Plan Supplement.

**ARTICLE 5**
**NO DISCHARGE OF DEBTOR**

In accordance with § 1141(d)(3) of the Bankruptcy Code, the Debtor will not receive any discharge of debt in this Chapter 11 Case.

**ARTICLE 6**
**GENERAL PROVISIONS**

**6.1    Title to Assets**.

If a plan is confirmed under § 1191(a), except as otherwise provided in the Plan or in the order confirming the Plan, (i) confirmation of the Plan vests all of the property of the Estate in the Debtor, and (ii) after confirmation of the Plan, the property dealt with by the Plan is free and clear of all Claims and Equity Interests of Creditors, equity security holders, and of general partners in the Debtor.

If a plan is confirmed under § 1191(b), property of the Estate includes, in addition to the property specified in § 541, all property of the kind specified in that section that the Debtor acquires, as well as earnings from services performed by the Debtor, after the date of commencement of the case but before the case is closed, dismissed, or converted to a case under another chapter of the Bankruptcy Code.

**6.2    Binding Effect.**

If the Plan is confirmed, the provisions of the Plan will bind the Debtor, all Creditors, all Equity Interest Holders, and all other parties in interest, whether or not they accept the Plan and whether or not they object to confirmation of the Plan. The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of, the successors or assigns of such entity.

**6.3    Severability.**

If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

**6.4    Retention of Jurisdiction by the Bankruptcy Court.**

The proposed Confirmation Order will provide that the Bankruptcy Court shall retain jurisdiction of this case with regard to the following matters: (i) to make such orders as are necessary or appropriate to implement the provisions of this Plan and to resolve any disputes arising from implementation of the Plan; (ii) to rule on any modification of the Plan proposed under section 1193; (iii) to hear and allow all applications for compensation to professionals and other Administrative Expenses; (iv) to resolve all issues regarding Claims objections, and issues arising from the assumption/rejection of the Executory Contracts; (v) to adjudicate any cause of action which may exist in favor of the Debtor, including preference and fraudulent transfer causes of action and Assigned Litigation Claims; and (vi) to hear any other matter not inconsistent with the provisions of the Bankruptcy Code.

**6.5    Captions.**

The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

**6.6    Modification of Plan.**

The Debtor may modify the Plan at any time before confirmation of the Plan pursuant to § 1193(a). However, the Bankruptcy Court may require additional items including re-voting on the Plan.

If the Plan is confirmed under Section 1191(a), the Debtor may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated *and* (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

If the Plan is confirmed under Section 1191(b), the Debtor may seek to modify the Plan at any time only if (1) it is within 3 years of the Confirmation Date, or such longer time not to exceed 5 years as fixed by the Court *and* (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

**6.7    Final Decree.**

Once the Estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Litigation Trustee, or such other party as the Bankruptcy Court shall designate in the Plan Confirmation Order, shall file a motion with the Bankruptcy Court to obtain a final decree to close the case. Alternatively, the Bankruptcy Court may enter such a final decree on its own motion.

**6.8    Immediate Binding Effect.**

Notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or any other Bankruptcy Rule, upon the occurrence of the Effective Date, the terms of this Plan and the Litigation Trust Agreement shall be immediately effective and enforceable and deemed binding upon the Debtor,

the Litigation Trustee, the Litigation Trust, any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted this Plan), all persons that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in this Plan, each person acquiring property under this Plan, and any and all non-Debtor parties to Executory Contracts with the Debtor.

### 6.9   Compromise and Settlement of Claims, Interests and Controversies.

Pursuant to sections 363 and 1123(b) of the Bankruptcy Code and in consideration for the Distributions and other benefits provided pursuant to this Plan, the provisions of this Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any Distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its Estate and Holders of Claims and Interests and is fair, equitable and reasonable.

### 6.10   Releases by the Debtor.

Pursuant to section 1123(b) of the Bankruptcy Code and except as otherwise specifically provided in this Plan or the Plan Supplement, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious liquidation of the Debtor and the consummation of the transactions contemplated by this Plan and assistance with respect to the Assigned Litigation Claims and Estate Causes of Action, on the Effective Date, the Released Parties are deemed forever released by the Debtor and its Estate, and each of their successors and assigns, from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtor or the Estate, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtor or its Estate would have been legally entitled to assert in its own right (whether individually or collectively) based on or relating to, or in any manner arising from, in whole or in part, the Debtor's Chapter 11 Case, the business or contractual arrangements between the Debtor and any of the Released Parties, the negotiation, formulation or preparation of this Plan, any Plan Supplement or related agreements, instruments or other documents (collectively, the "Debtor Released Claims"), other than Debtor Released Claims against a Released Party arising out of the gross negligence, willful misconduct, intentional fraud, or criminal liability of any such person or entity.

### 6.11   Releases by Holders of Claims and Interests.

**On the Effective Date, except as otherwise provided herein and except for the right to enforce this Plan, all persons who (i) (a) voted to accept this Plan or who are presumed or deemed to have voted to accept this Plan under section 1126(f) of the Bankruptcy Code or (b) are entitled to vote to accept or reject this Plan and who vote to reject this Plan and (ii) do not mark their Ballots as opting out of the releases granted under this section, shall, to the fullest extent permitted by applicable law, be deemed to forever release, and waive the Released Parties of and from all liens, claims, causes of action, liabilities,**

**encumbrances, security interests, interests or charges of any nature or description whatsoever based or relating to, or in any manner arising from, in whole or in part, the Debtor's Chapter 11 Case or affecting property of the Estate, whether known or unknown, suspected or unsuspected, scheduled or unscheduled, contingent or not contingent, unliquidated or fixed, admitted or disputed, matured or unmatured, senior or subordinated, whether assertable directly or derivatively by, through, or related to any of the Released Parties and their successors and assigns whether at law, in equity or otherwise, based upon any condition, event, act, omission occurrence, transaction or other activity, inactivity, instrument or other agreement of any kind or nature occurring, arising or existing prior to the Effective Date in any way relating to or arising out of, in whole or in part, the Debtor, the Debtor's prepetition operations, governance, financing, or fundraising, the purchase or sale of the Debtor's securities, the Chapter 11 Case, the pursuit of Confirmation of this Plan, the negotiation and consummation of the Asset sales, the consummation of this Plan or the administration of this Plan, including without limitation, the negotiation and solicitation of this Plan, all regardless of whether (a) a Proof of Claim or Equity Interest has been filed or is deemed to have been filed, (b) such Claim or Equity Interest is allowed, or (c) the Holder of such Claim or Equity Interest has voted to accept or reject this Plan, except for willful misconduct, gross negligence, fraud or criminal misconduct. Nothing contained herein shall impact the right of any Holder of an Allowed Claim or interest to receive a Distribution on account of its Allowed Claim or Allowed Interest in accordance with this Plan.**

### 6.12  Exculpation.

None of the Exculpated Parties shall have or incur any liability to any Holder of a Claim or Interest, or other party in interest, or any of their respective members, officers, directors, employees, advisors, professionals, attorneys or agents or any of their successors and assigns, with respect to any Exculpated Claim, including, without limitation, any act or omission in connection with, related to, or arising out of, in whole or in part, the Debtor's Chapter 11 Case, except for willful misconduct, gross negligence, fraud or criminal misconduct as determined by a Final Order of a court of competent jurisdiction, and, in all respects, the Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.

### 6.13  Injunction.

**From and after the Effective Date, all persons who have held, hold or may hold Claims against or Interests in the Debtor are permanently enjoined from commencing or continuing in any manner, any Cause of Action released or to be released pursuant to this Plan or the Confirmation Order, from and after the Effective Date, to the extent of the releases and exculpation granted in this Plan, the Releasing Parties shall be permanently enjoined from commencing or continuing in any manner against the Released Parties and the Exculpated Parties and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any claim, demand, liability, obligation, debt, right, cause of action, interest or remedy released or to be released pursuant to this Plan. except as otherwise expressly provided in this Plan, the Plan Supplement or related documents, or for obligations issued pursuant to this Plan, all persons who have held, hold or may hold Claims or Interests that have been released, discharged, or are subject to**

exculpation, are permanently enjoined, from and after the Effective Date, from taking any of the following actions: (a) commencing or continuing in any manner any Action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against such persons on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting or enforcing any encumbrance of any kind against such persons or the property or estates of such persons on account of or in connection with or with respect to any such Claims or Interests; and (d) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released, settled or discharged pursuant to this Plan.

### 6.14    Term of Injunctions or Stays.

Unless otherwise provided in this Plan or Confirmation Order, all injunctions or stays provided for under this Plan and ordered in the Confirmation Order or pursuant to sections 105 or 362 of the Bankruptcy Code arising under or entered during the Chapter 11 Case, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay and to the extent consistent with the terms and provisions of this Plan or the Confirmation Order, as applicable.

### 6.15    Injunction Against Interference with Plan.

Upon the Bankruptcy Court's entry of the Confirmation Order, all Holders of Claims and Interests, the Debtor, and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the Debtor's, the Litigation Trust's, the Litigation Trustee's, and their respective affiliates', employees', advisors', officers' and directors', and agents' implementation or consummation of this Plan.

### 6.16    Effectuating Documents and Further Transactions.

Upon entry of the Confirmation Order, the appropriate officers of the Debtor and the Litigation Trustee shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, consents, certificates, resolutions, programs, and other agreements and/or documents, and take such acts and actions as may be reasonably necessary or appropriate to effectuate, implement, consummate, and/or further evidence the terms and conditions of this Plan and any transactions described in or contemplated by this Plan. The Debtor or Litigation Trustee, as applicable, may, and all Holders of Allowed Claims or Interests receiving Distributions pursuant to this Plan, at the request or direction of the Debtor or Litigation Trustee, as applicable, shall, from time to time, prepare, execute, and deliver any agreements or documents, and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

### 6.17    Corporate Action.

Upon the Effective Date, all actions contemplated by this Plan shall be deemed authorized and approved in all respects (whether to occur before, on or after the Effective Date).

All matters provided for in this Plan involving the corporate structure of the Debtor, and any corporate action required by the Debtor in connection with this Plan be deemed to have occurred and shall be in effect, without any requirement of further action by the directors or officers of the Debtor.

**6.18** **Dissolution of the Debtor**.

On the Effective Date and upon the Debtor causing the Litigation Trust Assets to be transferred to the Litigation Trust in accordance with this Plan, the Debtor shall have no further duties or responsibilities in connection with implementation of this Plan. No later than upon entry of a final decree closing the Debtor's Chapter 11 Case, the Debtor shall be deemed dissolved for all purposes in accordance with applicable state law without the need to take any further action or file any plan of dissolution, notice, or application. Notwithstanding the dissolution of the Debtor, the Litigation Trustee shall (i) be empowered to prosecute Estate Causes of Action in the name of the Debtor and (ii) execute any documents (including tax returns) in the name of the Debtor and its Subsidiaries

**6.19** **Abandonment**.

On the Confirmation Date, the Debtor shall be deemed to have abandoned pursuant to Section 554 of the Bankruptcy Code, those Estate Assets identified in the Plan Supplement.

**6.20** **Subchapter V Trustee**.

To the extent that the Plan is confirmed by the Bankruptcy Court as a non-consensual plan under section 1191(b) of the Bankruptcy Code, the Subchapter V Trustee shall continue to serve in the Chapter 11 Case to monitor the Liquidating Trustee's progress in consummating the Plan. The Subchapter V Trustee shall be entitled to be compensated from the assets of the Liquidating Trust at her standard hourly rates for reasonable time incurred post-confirmation monitoring the Chapter 11 Case. The Subchapter V Trustee shall monitor the Chapter 11 Case concurrently with, and not in place of, the Trust Oversight Board.

## ARTICLE 7
## ATTACHMENTS

The following documents are deemed to be part of the Plan:

- Debtor's Organizational Chart, annexed as Exhibit A.

- The Executive Summary, annexed as Exhibit B.

- Executory Contracts to be Assumed, to be included in the Plan Supplement.

- Debtor's Financial Projections (including Debtor's Assets and Liabilities, Cash on hand as of the Effective Date, and sources and uses of Cash), to be included in the Plan Supplement.

- Liquidation Analysis, to be included in the Plan Supplement.

## ARTICLE 8
## FREQUENTLY ASKED QUESTIONS

**What Is Augustus Intelligence Inc. Attempting to Do in Chapter 11?** Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor attempts to restructure the claims held against it. Formulation and confirmation of a plan is the primary goal of Chapter 11. When reorganization is not feasible, however, a debtor may propose a liquidating plan under Chapter 11. The plan is the legal document which sets forth the manner and the means by which holders of claims against a debtor will be treated.

**Why Am I Receiving This Plan?** In order to confirm a plan of liquidation, the Bankruptcy Code requires that a debtor solicit acceptances of a proposed plan, which it is doing with this Plan. If parties entitled to vote on the proposed plan are satisfied with the information provided in the Plan and the terms of the Plan as proposed, and have voted for the Plan and returned the requisite number of ballots to counsel for the Debtor, the Bankruptcy Court may confirm the Plan as proposed by the Debtor.

**How Do I Determine Which Class I Am In?** To determine the class of your Claim or Interest, you must first determine whether your Claim is secured or unsecured. Your Claim is secured if you have a validly perfected security interest in collateral owned by the Debtor. If you do not have any collateral, your Claim is unsecured. Article II of the Plan above sets forth all classes of Claims and Interests and the treatment provided to the class in which your Claim or Interest is grouped. Article II of the Plan also explains, among other things, what the class is comprised of, the size of the class, what you will receive if the Plan is confirmed, and when you will receive what the Plan has provided for you if the Plan is confirmed.

**Why Is Confirmation of a Plan of Liquidation Important?** Confirmation of the Plan is necessary because if the Plan is confirmed, the Debtor and all of its Creditors and Equity Interest Holders are bound by the terms of the Plan. If the Plan is not confirmed, the Debtor may not pay Creditors or Equity Interest Holders as proposed in the Plan while the Debtor remains in bankruptcy.

**What Is Necessary to Confirm a Plan of Liquidation?** Confirmation of the Plan requires, among other things, the vote in favor of the Plan of two-thirds in total dollar amount and a majority in number of claims or interests actually voting in each voting class. If the vote is insufficient, the Bankruptcy Court can still confirm the Plan, but only if certain additional elements are shown including that the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

**Am I Entitled to Vote on the Plan?** Any creditor of the Debtor whose claim is impaired under the Plan is entitled to vote, if either (i) the creditor's claim has been scheduled by the Debtor and such claim is not scheduled as disputed, contingent, or unliquidated, or (ii) the creditor has filed a proof of claim on or before the last date set by the Bankruptcy Court for such filings. Any claim to which an objection has been filed (and such objection is still pending) is not entitled to vote, unless the Bankruptcy Court temporarily allows the creditor to vote upon the creditor's motion. Such motion must be heard and determined by the Bankruptcy Court prior to the date established by the Bankruptcy Court to confirm the Plan. Any equity holder of the

Debtor is entitled to vote, if either (i) the equity interest was included in the Amended List of Equity Security Holders filed by the Debtor on May 27, 2021 [Doc. No. 54], or (ii) the equity holder has filed a proof of interest on or before the last date set by the Bankruptcy Court for such filings. Any interest to which an objection has been filed (and such objection is still pending) is not entitled to vote, unless the Bankruptcy Court temporarily allows the interest holder to vote upon the interest holder's motion. Such motion must be heard and determined by the Bankruptcy Court prior to the date established by the Bankruptcy Court to confirm the Plan.

**How Do I Determine Whether I Am in an Impaired Class?** Article II of the Plan identifies the classes of creditors and interest holders whose claims are impaired. If your claim or interest is impaired, your vote will be considered by the Bankruptcy Court.

**When Is the Deadline by Which I Need to Return My Ballot?** The Plan is being distributed to all claim and interest holders for their review, consideration and approval. The deadline by which ballots must be returned is June 27, 2022 by 4:00 p.m. PCT. Ballots should be mailed to the following address: **AUGUSTUS BALLOT PROCESSING c/o STRETTO, 410 EXCHANGE, SUITE 100, IRVINE, CA 92602**.

**How Do I Determine When and How Much I Will Be Paid?** In Article II, the Debtor has provided both written and financial summaries of what it estimates each class of Claims and Interests will receive under the Plan.

## ARTICLE 9
## DEFINITIONS

**9.1**    The definitions and rules of construction set forth in §§ 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Code are used in this Plan. The definitions that follow that are found in the Code are for convenience of reference only, and are superseded by the definitions found in the Code. The following defined terms are in addition to the defined terms set forth above in the Plan:

**9.2**    **Administrative Claimant:** Any person entitled to payment of an Administration Expense.

**9.3**    **Administrative Expense:** Any cost or expense of administration of the Chapter 11 Case entitled to priority under Section 507(a)(2) of the Code and allowed under Section 503(b) of the Code, including without limitation, any actual and necessary expenses of preserving the Debtor's Estate, any actual and necessary expenses incurred following the filing of the bankruptcy petition by the Debtor, allowances of compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under the Bankruptcy Code, the Allowed Claim of the Trustee for fees and/or reimbursements, and any fees or charges assessed against the Debtor's Estate under Chapter 123, Title 28, United States Code.

**9.4**    **Administrative Tax Claim:** Any tax incurred pursuant to Section 503(b)(1)(B) of the Code.

**9.5**    **Allowed Claim:** Any Claim against the Debtor pursuant to Section 502 of the Code to the extent that: (a) a Proof of Claim was either timely filed or was filed late with leave of the Bankruptcy Court or without objection by the Debtor or the Litigation Trustee, and (b) as to

which either (i) a party in interest, including the Debtor or the Litigation Trustee, does not timely file an objection, or (ii) is allowed by a Final Order.

**9.6     Allowed Interests:**  Any Interest against the Debtor pursuant to Section 502 of the Code to the extent that: (a) it is listed on the Debtor's amended list of Equity Interest Holders [Doc. No. 54], or (b) a Proof of Interest was either timely filed or was filed late with leave of the Bankruptcy Court or without objection by the Debtor or the Litigation Trustee, as to which either (i) a party in interest, including the Debtor or the Litigation Trustee, does not timely file an objection, or (ii) is allowed by a Final Order.

**9.7     Allowed Priority Claim:**  A Priority Claim to the extent that it is or has become an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtor shall be entitled on the Confirmation Date.

**9.8     Allowed General Unsecured Claim**: An Unsecured Claim to the extent it is, or has become, an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtor shall be entitled on the Confirmation Date.

**9.9     Allowed Secured Claim:**  Allowed Secured Claims are Claims secured by property of the Debtor's bankruptcy Estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code.

**9.10     Assigned Litigation Claims:** Those claims and Causes of Action that holders of Equity Interests may have against parties other than the Debtor which arise out of, in connection with or relate to their purchase of their Equity Interests, which they affirmatively elect to assign to the Litigation Trust through the execution of the Assigned Litigation Claim Election, which such claims, to the extent viable, will be pursued either separately or alongside other Causes of Actions being pursued by the Litigation Trustee against such parties.

**9.11     Assigned Litigation Claim Election:** In respect to a holder of Equity Interests, the agreement of such holder to assign and contribute such holder's Assigned Litigation Claims to the Litigation Trust, which election shall be evidenced by affirmatively agreeing to such assignment and contribution by filling out, executing and delivering to the Claims Agent, together with their completed Ballot, the Assignment of Claim form included in the solicitation package sent Creditors and Equityholders with a copy of this Plan.

**9.12     Avoidance Action**: Means claims or causes of action arising under Bankruptcy Code sections 502, 510, 541, 544, 545, 547, 548, 549, 550, 551 or 553, or under related state or federal statutes and common law, including, without limitation, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, or the Uniform Voidable Transfer Act (including any similar laws of each of the foregoing enacted by any state, commonwealth or territory of the United States), and any law of similar effect, whether or not litigation is commenced to prosecute such claims or causes of action.

**9.13     Bankruptcy Code or Code**: The Bankruptcy Reform Act of 1978, as amended and codified as Title 11, United States Code.

**9.14     Bankruptcy Court or Court**: The United States Bankruptcy Court for the District of Delaware.

**9.15    Bankruptcy Rules**: The Federal Rules of Bankruptcy Procedure.

**9.16    Beneficiaries**: The Holders of Allowed Secured Claims, Allowed General Unsecured Claims and Allowed Interests against the Debtor's Estate as beneficiaries of the Litigation Trust, as set forth in this Plan and the Litigation Trust Agreement.

**9.17    Business Day**: Means any day of the calendar week, except Saturday, Sunday, a "legal holiday," as defined in Bankruptcy Rule 9006(a), or any day on which commercial banks are authorized or required by law to close in Wilmington, Delaware.

**9.18    Cash**: Cash, cash equivalents and other readily marketable securities or instruments issued by a person other than the Debtor, including, without limitation, readily marketable direct obligations of the United States of America, certificates of deposit issued by banks and commercial paper of any entity, including interest accrued or earned thereon.

**9.19    Causes of Action**: Means any claim (other than the Claims against the Debtor), cause of action, controversy, demand, agreement, right (including to legal or equitable remedies), action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and/or franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. Cause of Action also includes without limitation: (a) any right of setoff, counterclaim, or recoupment and/or any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any Avoidance Action. The term "Causes of Action" shall include, without limitation, those actions and claims described in the report prepared by Armstrong Teasdale.

**9.20    Chapter 11 Case**: This case under chapter 11 of the Bankruptcy Code in which Augustus Intelligence Inc. is the debtor and debtor-in-possession.

**9.21    Claim:** Any "right to payment from the Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or any right to an equitable remedy for future performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, disputed, undisputed, secured or unsecured." 11 U.S.C. § 101(5).

**9.22    Class**: A category of holders of claims or interests which are substantially similar to the other claims or interests in such class.

**9.23    Confirmation Date**: The Date upon which the Bankruptcy Court shall enter the Confirmation Order; provided however, that if on motion the Confirmation Order or consummation of the Plan is stayed pending appeal, then the Confirmation Date shall be the entry of the Final Order vacating such stay or the date on which such stay expires and is no longer in effect.

**9.24** **Confirmation Hearing**: The hearing scheduled to be held on July 26, 2022 at :00 p.m. EST or any adjourned date thereafter to consider confirmation of the Plan.

**9.25** **Confirmation Order**: An order of the Bankruptcy Court or any amendment thereto confirming the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.

**9.26** **Creditor**: Any person who has a Claim against the Debtor that arose on or before the Petition Date.

**9.27** **Debtor**: Augustus Intelligence Inc., the debtor and debtor-in-possession in this Chapter 11 Case.

**9.28** **Debtor's Assets:** Means all property and assets of the Debtor, including, without limitation Causes of Action and Avoidance Actions and any rights under Insurance Policies.

**9.29** **Detailed Report:** The privileged Internal Investigation Report Prepared by Armstrong Teasdale, LLP for Augustus Intelligence dated December 17, 2021 and accompanying Forensic Report prepared by Alix Partners LLP.

**9.30** **Disputed**: Means any Administrative Expense, Claim, or Interest (i) proof of which was not timely filed or asserted in this Chapter 11 Case or (ii) as to which the Debtor has in any way objected to, challenged or otherwise disputed.

**9.31** **DIP Facility.** Means the Debtor-in-Possession financing facility approved by Final Order of the Bankruptcy Court entered on June 3, 20210 [Doc. No. 84].

**9.32** **DIP Lender.** Means AI Loan Company LLC, its managing members, members, and their members.

**9.33** **Distributions**: The property required by the Plan to be distributed to the holders of Allowed Claims or Allowed Interests, as applicable.

**9.34** **Distribution Record Date**:   Means five (5) Business Days prior to the Confirmation Date or any subsequent date established by the Litigation Trustee upon notice to all Holders of Claims or Interests that may receive a Distribution from the Litigation Trust.

**9.35** **Effective Date**: Means the date that is a Business Day designated by the Debtor in a notice filed with the Bankruptcy Court on which (a) each of the conditions set forth in the Plan have been satisfied or waived (if waivable), and (b) no stay of the Confirmation Order is in effect.

**9.36** **Estate**: The estate created in the Debtor's Chapter 11 Case containing all assets of the Debtor pursuant to Bankruptcy Code section 541.

**9.37** **Equity Interest or Interest**: An ownership interest in the Debtor.

**9.38** **Exculpated Parties**. Each of: (i) the Debtor; (ii) the Debtor's professionals retained in this Chapter 11 Case pursuant to an Order of the Bankruptcy Court; (iii) the

Subchapter V Trustee; and (iv) the Debtor's officers and the Current Board and the members thereof as of the Effective Date.  Any former Board member of the Debtor or former officer of Debtor who is not participating in the DIP Financing Facility or is not a Litigation Trust Funder shall not have the benefit of the exculpation or releases granted pursuant to this Plan or the Confirmation Order.

**9.39    Executive Summary:** The Executive Summary of the Internal Investigation Report Prepared by Armstrong Teasdale, LLP for Augustus Intelligence dated February 8, 2022, a copy of which is annexed hereto as Exhibit B.

**9.40    Executory Contracts**: All unexpired leases and executory contracts as described in Section 365 of the Bankruptcy Code.

**9.41    Final Order**: An order or judgment of the Bankruptcy Court that has not been reversed, stayed, modified or amended and as to which (a) any appeal that has been taken has been finally determined or dismissed, or (b) the time for appeal has expired and no notice of appeal has been filed.

**9.42    Holder**: The legal or beneficial holder of a Claim or Interest.

**9.43    Insurance Policies**: Collectively, all of the Debtor's insurance policies.

**9.44    IRC**: The Internal Revenue Code.

**9.45    Interest Holder:** The Holder of an Equity Interest or Interest.

**9.46    Lien**: Has the meaning set forth in section 101(37) of the Bankruptcy Code.

**9.47    Litigation Trust**: The grantor trust to be created upon the Effective Date for the benefit of the Beneficiaries.

**9.48    Litigation Trust Agreement**: The agreement, substantially in the form included in the Plan Supplement, governing the operations of the Litigation Trust, as such agreement may be subsequently amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

**9.49    Litigation Trust Assets**: The assets held in the Litigation Trust comprised of all of the Debtor's Assets on the Effective Date, including but not limited to the Causes of Action and the Assigned Litigation Claims.

**9.50    Litigation Trust Distributable Cash**: The Litigation Trust Cash and any other Assets of the Litigation Trust reduced to Cash net of all expenses and costs of operating or effectuating the duties of the Litigation Trust and establishing any reserves as the Litigation Trustee may determine is necessary with the consent of the Litigation Trust Oversight Board pursuant to the terms of this Plan and the Litigation Trust Agreement.

**9.51    Litigation Trust Funders:** The individuals who have agreed to provide, either directly or through an entity controlled by them, Litigation Trust Funding.

**9.52    Litigation Trust Funding:** Any funding to be provided to the Litigation Trust by Litigation Trust Funders, the terms of which shall be set forth in the Plan Supplement.

**9.53    Litigation Trust Oversight Board**: Shall have the meaning set forth in section 2.5.

**9.54    Litigation Trust Professionals**: Shall have the meaning set forth in section 2.5.

**9.55    Litigation Trust Reserve**: An amount sufficient to fund the accrued and estimated expenses and costs of operating or effectuating the duties of the Litigation Trust, as may be incurred from time to time by the Litigation Trustee and approved by the Litigation Trust Oversight Board pursuant to the Litigation Trust Agreement.

**9.56    Litigation Trustee**: The individual or entity designated and retained as the trustee to the Litigation Trust, as of the Effective Date or as soon as reasonably practicable thereafter, as the fiduciary responsible for administering the Litigation Trust.

**9.57    Petition Date**: April 24, 2021, the date the chapter 11 petition for relief was filed.

**9.58    Plan**: This Plan, either in its present form or as it may be altered, amended, or modified from time to time.

**9.59    Plan Supplement:** Shall mean the additional documents and exhibits to be filed by the Debtor in connection with this Plan by the Plan Supplement Deadline.

**9.60    Plan Supplement Deadline:** Shall mean July 8, 2022 or the first business day that is not sooner than fourteen days prior to the Confirmation Hearing.

**9.61    Priority Tax Claim**: Any Claim entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.

**9.62    Pro Rata**: Means the proportion that the amount of a Claim or Interests in a particular Class or Classes bears to the aggregate amount of all Allowed Claims or Interests in such Class or Classes, unless the Plan otherwise provides.

**9.63    Released Parties**. each of: (i) the Debtor's professionals retained in this Chapter 11 Case pursuant to an Order of the Bankruptcy Court; (ii) the Subchapter V Trustee; (iii) the Debtor's officers and the Current Board and the members thereof as of the Confirmation Date, and any professionals retained prepetition by the Current Board; (iv) the DIP Lender, in its capacity as DIP Lender; (v) the Litigation Trustee, any professionals retained by the Litigation Trustee; and (vi) the Litigation Trust Oversight Board and the members thereof, solely in their capacity as such and any professionals retained by the Litigation Trust Oversight Board, and (vii) any Litigation Trust Funder identified in the Plan Supplement; provided that any Holder of a Claim or Interest that elects to "opt out" of granting the Plan's third-party releases by either opting out of such release or timely objecting to the Plan's third-party release provisions shall not be a "Released Party." Any former Board member of the Debtor or former officer of Debtor who is not participating in the DIP Financing Facility or is not a Litigation Trust Funder shall not have the benefit of any exculpations or releases granted pursuant to this Plan or the Confirmation

Order, and all Causes of Action against such former Board member and/or former officer are preserved.

**9.64**   <u>**Schedules**</u>: Schedules and Statement of Financial Affairs, as amended, filed by the Debtor with the Bankruptcy Court listing liabilities and assets.

**9.65**   <u>**Subchapter V Trustee**</u>: Natasha Songonuga, Esq., the trustee appointed pursuant to 11 U.S.C. § 1183(a) and whose duties are prescribed under 11 U.S.C. 1183(b), the Plan, or the order confirming the Plan.

**9.66**   <u>**Subordinated Equity Interest:**</u> Means the Equity Interest of any Holder that is subordinated pursuant to an order of the Bankruptcy Court to other Equity Interests.

**9.67**   <u>**Unsecured Creditor**</u>: Any Creditor that holds a Claim in the Chapter 11 Case which is not a Secured Claim.

Augustus Intelligence Inc.

*/s/ [DRAFT]*
Brian Ryniker
Chief Restructuring Officer